**JOHN DOE**, Plaintiff–Appellant, v. **CITY AND COUNTY OF HONOLULU**, Defendant–Appellee

NO. 14568

(CIV. NO. 89–2826)

AUGUST 12, 1991

BURNS, C.J., HEEN, J., AND CIRCUIT JUDGE HUDDY, ASSIGNED BY REASON OF VACANCY*

---

*Associate Judge Tanaka, who heard oral argument in this case, retired on June 24, 1991. Thereafter, the case was reargued with Circuit Judge Huddy assigned to fill the vacancy.

**Per Curiam.** In *McCloskey v. Honolulu Police Department*, 71 Haw. 568, 799 P.2d 953 (1990), the supreme court determined that the Honolulu Police Department's (HPD) urinalysis drug testing program did not violate the right to privacy and unreasonable search provisions of the Hawaii Constitution. This case requires this court to decide whether the Honolulu Fire Department's (HFD) drug screening program by urine testing violates the right to be free from unreasonable searches and the right to privacy under both the United States and Hawaii Constitutions. We conclude that it does not, and affirm the circuit court's stipulated final judgment which denied an injunction to enjoin defendant City and County of Honolulu (City), a municipal corporation, through the HFD, from conducting any drug tests of plaintiff John Doe's (Doe)[1] urine.

---

[1] Plaintiff alleged that he was filing a complaint "anonymously to protect himself from breach of privacy, harassment, injury, ridicule, and/or embarrassment." Record, Vol. 1 at 1. The circuit court permitted plaintiff to pursue the action under the fictitious name of "JOHN DOE." *Id.* at 152.

## I. FACTS
### A. The Plaintiff

In 1974, Doe joined the HFD as a fire fighter. Before being hired, Doe was required to submit to a pre-employment physical examination, which included the giving of a urine sample and a digital rectal examination.

Since becoming a fire fighter, Doe "has undergone a complete annual physical examination which includes, but is not limited to, a digital rectal exam, a genitalia hernia exam, the drawing of a blood sample, the collection of a urine sample, the removal of all outer clothing except for undershorts in order to conduct a visual examination, and answering questions regarding certain personal information." Finding of Fact 8, Record, Vol. 4 at 147. Doe did not object to the tests and procedures of the annual physical examinations.

As a fire fighter, Doe is represented by the fire fighters' exclusive representative, the Hawaii Fire Fighters Association, Local 1463, AFL–CIO (Union). Francis Kennedy, Jr. (Kennedy) is the full–time business manager of the Union.

### B. The HFD Drug Screening Program

Sometime in late 1987, or early 1988, the HFD and the Union began discussions regarding the issue of drug testing for fire fighters. The HFD was concerned about the discovery of drugs in three fire stations and the possession or use of drugs by a few fire fighters. The Union favored "some kind of drug screening program." Exhibit 7, Kennedy's Deposition, at 36.

On July 18, 1989, the Union and the City entered into a Memorandum of Understanding, wherein the parties recognized that "the use and/or abuse of drugs and/or substances may adversely affect [a fire fighter's] health, safety, and job

performance and the health and safety of co–workers and the general public[.]" Exhibit C. The Memorandum stated that drug screening tests would: (1) assist the HFD "to identify and rehabilitate [fire fighters] who are illegal users of drugs"; (2) "deter and discourage the illegal use of drugs by [fire fighters]"; (3) "establish and create a safe working environment for the protection of all [fire fighters]"; (4) protect members of the public who use the HFD's facilities or services; and (5) "protect the public health, safety and welfare." *Id.* The Memorandum was not submitted to the rank and file fire fighters for their approval.

Thereafter, in September 1989, the HFD commenced a drug screening program (Program). The Program provides for drug testing (1) on a "regular or frequent basis"; (2) as part of a fire fighter's annual or pre–entry medical examination; (3) as part of "probationary requirements"; or (4) on "a reasonable suspicion basis[.]" Exhibit 4. This case involves drug testing as a part of a fire fighter's annual physical examination.

The Program sets forth in detail the procedures involving (1) collection of the fire fighter's urine specimen; (2) control of the specimen after collection; (3) transportation of the specimen to the laboratory; and (4) laboratory analysis of the specimen. The specimen is tested for five drugs: (1) marijuana; (2) cocaine; (3) opiates; (4) amphetamines; and (5) phencyclidine.[2] The laboratory initially tests the specimen by an immunoassay procedure. If the initial testing produces a positive result, the specimen is subjected to a confirmatory test utilizing gas chromatography/mass spectrometry techniques.

---

[2] The circuit court stated that the drugs tested for are "cocaine, amphetamines, marijuana, barbitu[r]ates, phencyclidine, opiates, benzodiazepine[.]" Finding of Fact 34, Record, Vol. 4 at 156. However, Edward M. L. Yee (Yee), the drug testing administrator, testified that the drugs tested for are "limited to marijuana, cocaine, the opiates, amphetamines and PCP." Exhibit 27, Yee's Deposition, at 48.

To maintain confidentiality, the specimen is identified by number only. The laboratory forwards the test result to the City physician. The City Health Department log of those who tested positive is secured under lock. The City physician reports all positive results to the HFD's drug testing administrator, who then informs only the Fire Chief and the battalion chief concerned.

Under the Program, "fire fighters who test positive for the first time are not disciplined but are allowed to enroll in an approved drug/substance abuse program at the fire fighter's expense." Finding of Fact 27, Record, Vol. 4 at 154.

## C. The Litigation

On September 14, 1989, Doe filed a complaint alleging that drug testing under the Program violated his civil liberties under both the United States and Hawaii Constitutions. Doe sought to enjoin the City from conducting drug testing under the Program.

On October 6, 1989, the circuit court issued an order requiring Doe to undergo and pass an annual physical examination and to provide a urine specimen as part of the examination. However, the court restrained the City from conducting any drug testing of the specimen pending the court's decision on Doe's motion for preliminary and injunctive relief.[3]

On December 18 and 19, 1989, the circuit court held a preliminary injunction hearing. Thereafter, on February 26, 1990, the court issued its findings of fact (FOF), conclusions of law (COL) and order denying Doe's motion for preliminary injunction. On June 20, 1990, the parties stipulated that the February 26, 1990

---

[3] In October 1989, plaintiff John Doe (Doe) submitted to an annual physical examination, which included the giving of a urine sample, but the urine sample was not tested for drugs.

FOF, COL, and order be "deemed to be the FINAL JUDGMENT disposing of all claims of all parties raised" in the case, which the court approved and so ordered. Record, Vol. 5 at 123–24. This appeal followed.

## II. FINDINGS OF FACT

Doe challenges 15 of the circuit court's 36 FOFs.[4] A careful review of the record discloses that all of the challenged FOFs are supported by substantial evidence. We therefore conclude that those FOFs are not clearly erroneous. *Kim v. State*, 62 Haw. 483, 492, 616 P.2d 1376, 1382 (1980). Furthermore, "we are not left with a definite and firm conviction that a mistake has been committed[.]" *Waugh v. University of Haw.*, 63 Haw. 117, 133, 621 P.2d 957, 969 (1980). We will discuss Doe's challenge to FOFs 3, 14, and 15 only.

FOF 3 states as follows:

3. This Court takes judicial notice of the fact that use and abuse of illegal drugs is a serious problem in society and that HFD's fire fighters, as members of society, are not immune from this pervasive social problem.

Record, Vol. 4 at 146. Doe argues that the court erred in judicially noticing that the use of illegal drugs is "a serious problem." We disagree.

In *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 674, 109 S. Ct. 1384, 1395, 103 L. Ed. 2d 685, 707 (1989), the Supreme Court stated:

[D]rug abuse is one of the most serious problems confronting our society today. There is little reason to

---

[4] Doe challenges findings of fact 1, 2, 3, 4, 5, 12, 14, 15, 25, 26, 31, 32, 33, 34, and 35.

believe that American workplaces are immune from this pervasive social problem[.]

In 1988, the Court of Appeals for the Third Circuit observed:

The enormity of the problem facing this country because of drug use is sufficiently well established to justify judicial notice.

*Transport Workers' Local 234 v. Southeastern Pa. Transp. Auth.*, 863 F.2d 1110, 1119 (3d Cir. 1988), *judgment vacated on other grounds*, 492 U.S. 902, 109 S. Ct. 3208, 106 L. Ed. 2d 560 (1989).

In our view, based on the availability of statistics well publicized in newspapers and periodicals, the circuit court did not err, pursuant to Hawaii Rules of Evidence Rule 201, in judicially noticing that the use of illegal drugs constituted a serious societal problem and that no segment of society, including fire fighters, was immune from this problem. *See State v. Lee*, 51 Haw. 516, 465 P.2d 573 (1970) (the alarming increase in fatalities and serious injuries due to motorcycle accidents was judicially noticed).

Moreover, the evidence in this case supports the judicially noticed fact. Robert L. DuPont, M.D. (Dr. DuPont), a psychiatrist with expertise in the area of drug testing in the workplace, testified:

The national drug abuse, the most recent national survey was released three or four months ago, describing the 1988 statistics, and it was reported that among Americans 20 to 40 years old, 22 percent had used an illicit drug in the last year.

The U. S. Chamber of Commerce estimated in 1989 that drug problems cost American employers $60 billion a year[.]

Exhibit P, Dr. DuPont's Deposition, at 19. Also, Kennedy testified: "I'm concerned that there's a developing drug problem [in the fire department]." Exhibit 7, Kennedy's Deposition, at 32.

We therefore conclude that FOF 3 is not clearly erroneous.

FOF 14 states in part that the HFD's various rules and regulations "expressly control and regulate [fire fighters'] *private* as well as professional lives." Record, Vol. 4 at 149 (emphasis added). FOF 15 provides in part that "because of the highly regulated nature of [Doe's] position as a fire fighter, his *private* as well as professional life was subject to continuous scrutiny and examination by HFD to determine his suitability and fitness to perform his duties as a fire fighter." *Id.* at 150 (emphasis added). Doe argues that these FOFs are clearly erroneous. We disagree.

Although the various rules and regulations generally regulate and control the professional lives of fire fighters, they also expressly and implicitly regulate various aspects of fire fighters' private lives. They expressly regulate fire fighters' private lives by precluding a fire fighter from (1) conducting himself in a manner "which would tend to impair the good order, proper discipline, or efficiency of the [HFD,]" Exhibit I, at 45; (2) "publicly criticiz[ing] or ridicul[ing] the [HFD], its policies, or other members [of the HFD,]" *id.*; (3) being financially interested in any business involving "the filling, refilling, or repairing of fire extinguishers or the manufacture of ingredients therefor" or "the installation or testing of fire extinguishing systems[,]" *id.* at 43; and (4) the "selling of fire alarm systems[.]" *Id.*

The rules and regulations implicitly affect a fire fighter's private life by regulating and controlling his conduct during duty hours. For example, a regulation requiring a fire fighter to be "clean shaven[,]" prohibiting "[b]eards and goatees[,]" and specifying the permissible length of hair and style of sideburns, Exhibit J, at Par. 521.01 *et seq.*, definitely affects his private life. HFD standards to "meet departmental health and fitness requirements[,]" Exhibit I, at 41, and to refrain from reporting to duty while "under the influence of any intoxicating liquor [or] drug" or being absent from duty "for reasons attributable to or produced by

indulgence in such intoxicants[,]" *id.* at 47, restrict a fire fighter's conduct during his off duty hours.

Accordingly, FOF 14 and 15 are not clearly erroneous.

## III. SEARCH UNDER THE UNITED STATES CONSTITUTION

The Fourth Amendment of the United States Constitution guarantees the people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" The Due Process Clause of the Fourteenth Amendment makes this right applicable to the States. *Wolf v. Colorado*, 338 U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949). "[G]overnment employers . . . are subject to the restraints of the Fourth Amendment." *O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S. Ct. 1492, 1496, 94 L. Ed. 2d 714, 721 (1987). Doe contends that suspicionless urine testing for drugs by the HFD under the Program is an unreasonable search under the Fourth Amendment. We disagree.

### A. The *Von Raab* and *Skinner* Decisions

In 1989, the United States Supreme Court decided two cases involving drug testing of government employees. In *National Treasury Employees Union v. Von Raab, supra*, the Court sustained the United States Customs Service's testing program requiring workers who seek transfer or promotion to specified positions to submit to urinalysis. In *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989), the Court upheld the Federal Railroad Administration's regulations mandating blood and urine testing of workers involved in certain train accidents or incidents.

We adopt Chief Judge Wald's analysis of the *Von Raab* and *Skinner* decisions in *Harmon v. Thornburgh*, 878 F.2d 484 (D.C.

Cir. 1989), *cert. denied*, ____ U.S. ____, 110 S. Ct. 865, 107 L. Ed. 2d 949 (1990). The Chief Judge gleaned the following general principles from those cases:

> Urinalysis, if compelled by the government, is a "scarch" subject to the restrictions of the fourth amendment. *See Skinner*, 109 S. Ct. at 1412–13; *Von Raab*, 109 S. Ct. at 1390. However, individualized suspicion of a particular employee is not required by the Constitution. *See Skinner*, 109 S. Ct. at 1417; *Von Raab*, 109 S. Ct. at 1390. Nor is it necessary that a documented drug problem exist within the particular workplace at issue. *See Von Raab*, 109 S. Ct. at 1395 ("The mere circumstance that all but a few of the employees tested are entirely innocent of wrongdoing does not impugn the program's validity."). Rather, "where a Fourth Amendment intrusion scrves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 109 S. Ct. at 1390; *accord, Skinner*, 109 S. Ct. at 1413–14.

*Harmon*, 878 F.2d at 487–88.

In *Von Raab* and *Skinner*, the Supreme Court identified three governmental interests that are sufficiently compelling to justify suspicionless drug testing: (1) ensuring that certain employees "have unimpeachable integrity and judgment[,]" *Von Raab*, 489 U.S. at 670, 109 S. Ct. at 1393, 103 L. Ed. 2d at 705; (2) enhancing public safety, *see Skinner*, 489 U.S. at 628, 109 S. Ct. at 1419, 103 L. Ed. 2d at 667; *Von Raab*, 489 U.S. at 670–71, 109 S. Ct. at 1393, 103 L. Ed. 2d at 705; and (3) "protecting truly sensitive information[.]" *Von Raab*, 489 U.S. at 677, 109 S. Ct. at 1396, 103 L. Ed. 2d at 709.

We apply the foregoing principles in determining whether the HFD's Program, which implements suspicionless drug testing of Doe's and his fellow fire fighters' urine, violates the Fourth Amendment.

## B. Application of the *Von Raab* and *Skinner* Principles

Doe argues that *Von Raab* and *Skinner* are inapplicable since the factual contexts of those cases differ from that in this case. *Von Raab* involved drug testing of Customs Service employees who sought transfers or promotions to positions involving interdiction of illegal drugs or the carrying of firearms. *Skinner* involved both blood and urine testing for drugs and alcohol of railway employees following the occurrence of certain train accidents. Doe stresses that this case, on the other hand, involves mandatory suspicionless urine testing for drugs. Post–*Von Raab* and *Skinner* federal cases, however, do not support Doe's argument.

Based on the *Von Raab* and *Skinner* general principles, federal courts have found no violation of the Fourth Amendment in the random urine testing for drugs of the following governmental employees: (1) United States Department of Agriculture's Food and Nutrition Service motor vehicle operators, *National Treasury Employees Union v. Yeutter*, 918 F.2d 968 (D.C. Cir. 1990); (2) United States Department of Transportation electronic technicians, aviation safety inspectors, motor carrier and highway safety specialists, railroad safety inspectors, civil aviation security specialists, and motor vehicle operators, *American Fed'n of Gov't Employees v. Skinner*, 885 F.2d 884 (D.C. Cir. 1989), *cert. denied*, ____ U.S. ____, 110 S. Ct. 1960, 109 L. Ed. 2d 321 (1990); (3) United States Army civilian employees who are air traffic controllers, pilots, aviation mechanics, aircraft attendants, nuclear reactor operators, nuclear weapons technicians, civilian police and

guards, *National Fed'n of Fed. Employees v. Cheney*, 884 F.2d 603 (D.C. Cir. 1989), *cert. denied*, ____ U.S. ____, 110 S. Ct. 864, 107 L. Ed. 2d 948 (1990) (hereinafter *Cheney*); and (4) United States Department of Justice employees "who hold top secret national security clearances." *Harmon*, 878 F.2d at 493. Moreover, the fact that the drug testing is on a random, rather than pre–transfer or promotion (*Von Raab*) or post–accident (*Skinner*), basis does not require "a fundamentally different analysis from that pursued by the Supreme Court in *Von Raab*." *Harmon*, 878 F.2d at 489.

The HFD recognizes that "the use and/or abuse of drugs and/ or substances may adversely affect an employee's health, safety and job performance as well as the health and safety of his/her co–workers and members of the general public[.]" Exhibit 4 at 1. The stated purpose of the Program is to assist the HFD in identifying prospective and current employees who use drugs and to "aid in the rehabilitation of employees with substance abuse problems." *Id.*

Therefore, urine testing for drugs by the HFD, a Fourth Amendment intrusion, "serves special governmental needs, beyond the normal need for law enforcement[.]" *Von Raab*, 489 U.S. at 665, 109 S. Ct. at 1390, 103 L. Ed. 2d at 702. Consequently, we must proceed to balance Doe's and the fire fighters' privacy expectations against the City's interests. If the City's interests, other than its normal need for law enforcement, are compelling and outweigh Doe's and the fire fighters' privacy interests, we must uphold the HFD's Program.

## C. Privacy Expectations

In the instant case, the fire fighters, including Doe, have a diminished expectation of privacy, and thus the HFD drug testing is minimally intrusive.

## 1. Diminished Expectation of Privacy

Where a type of public employment requires employees to comply with rules and regulations bearing upon their health and fitness, "the expectations of privacy of [these] employees are diminished[.]" *Skinner*, 489 U.S. at 627, 109 S. Ct. at 1418, 103 L. Ed. 2d at 666. Here, the regulations require all fire fighters, including Doe, to undergo annual physical examinations. Doe himself has taken about fifteen annual physical examinations, which included the drawing of blood samples, the collection of urine samples, and the answering of "questions regarding certain personal information." FOF 8, Record, Vol. 4 at 147. Doe has not objected to any aspect of the physical examinations, including the collection of urine samples, other than the urinalysis for the detection of drugs. The urine collection process, therefore, is not a basis for any privacy intrusiveness objection.

In *Von Raab*, the Supreme Court stated that employees involved in drug interdiction and employees who are required to carry firearms "reasonably should expect effective inquiry into their fitness and probity . . . [b]ecause successful performance of their duties depends uniquely on their judgment and dexterity[.]" 489 U.S. at 672, 109 S. Ct. at 1394, 103 L. Ed. 2d at 706. The Court therefore concluded that "these employees cannot reasonably expect to keep from the [Customs] Service personal information that bears directly on their fitness." *Id.*

Here, the circuit court found, and Doe does not dispute, that, in order to perform his or her duty, a fire fighter must possess "strength, stamina, aerobic and anaerobic fitness, judgment, mental alertness, memory and the ability to work with people[,]" FOF 9, Record, Vol. 4 at 148, and, because of being subject to recall at all times and to work irregular hours, a fire fighter "must be physically fit, mentally alert and capable of exercising sound judgment." FOF 11, *id.* Like the Customs Service employees

in *Von Raab*, Doe and his fellow fire fighters should expect "effective inquiry into their fitness and probity." Consequently, their privacy interests are diminished in this regard.

Doe has a concern about the strictly personal information that urinalysis may disclose. To the extent that "chemical analysis of urine . . . can reveal a host of private medical facts about an employee, including whether [the employee] is epileptic, pregnant, or diabetic[,]" *Skinner*, 489 U.S. at 617, 109 S. Ct. at 1413, 103 L. Ed. 2d at 659, urinalysis intrudes upon privacy interests. Here, however, the urinalysis is conducted in conjunction with a fire fighter's annual physical examination, which is accepted by the fire fighter as necessary for his or her continued employment. The purpose of the annual physical examination is to uncover all medical facts having a bearing on the fire fighter's health and fitness in performing his or her duties. Consequently, urinalysis will not likely reveal any personal information, other than the use of drugs, that has not already been uncovered in the annual physical examination, which Doe did not challenge prior to the institution of the Program.

## 2. Less Intrusive Alternatives

Doe argues that there are less intrusive alternatives to detect drug use than by urine testing. He suggests direct observation of a fire fighter in the workplace or psychomotor and cognitive tests. The circuit court found, however, that "drug use by fire fighters cannot be detected through direct observation[,]" FOF 31, Record, Vol. 4 at 155, and that "[p]sychomotor tests and cognitive tests do not detect drug use." FOF 32, *id.* Furthermore, "[t]he use of psychomotor and cognitive tests is far more intrusive than urinalysis because the use of these tests require[s] further inquiry into the personal affairs of individuals touching on matters of privacy." *Id.* As indicated above, these findings are not clearly erroneous. In

*Cheney*, the court similarly recognized that "neurobehavioral testing" is not "less intrusive or less degrading than urinalysis testing." 884 F.2d at 610–11.

Additionally, the Supreme Court has repeatedly stated that the " 'reasonableness of any particular government activity does not necessarily or invariably turn on the existence of alternative "less intrusive" means.' " *Skinner*, 489 U.S. 629 n.9, 109 S. Ct. at 1419 n.9, 103 L. Ed. 2d at 667 n.9 (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S. Ct. 2605, 2610, 77 L. Ed. 2d 65, 72 (1983)). Neither is it fatal that urinalysis drug testing does not differentiate between on–the–job versus off–the–job use or impairment. *See Cheney*, 884 F.2d at 609.

In sum, we conclude, as the circuit court did, that the drug testing of a fire fighter's urine, as a part of a regular annual physical examination, minimally intrudes on Doe's and his fellow fire fighters' Fourth Amendment privacy interests.

## D. Governmental Interests

Doe asserts that any governmental interests implicated in the HFD's Program are not compelling enough to justify an infringement on his privacy expectations. We do not agree.

In *Von Raab*, the Supreme Court declared that "the Government has a compelling interest in ensuring that front–line interdiction [Customs Service] personnel are physically fit, and have unimpeachable integrity and judgment." 489 U.S. at 670, 109 S. Ct. at 1393, 103 L. Ed. 2d at 705. The Court stated that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force." 489 U.S. at 671, 109 S. Ct. at 1393, 103 L. Ed. 2d at 705. In *Skinner*, the Supreme Court observed that railway workers subject to drug testing "discharge duties fraught with such risks of injury to others that even a

momentary lapse of attention can have disastrous consequences." 489 U.S. at 628, 109 S. Ct. at 1419, 103 L. Ed. 2d at 667.

FOF 11, Record, Vol. 4 at 148, which Doe does not dispute, states in part as follows:

> Whenever fire fighters are called to emergencies, they are placed in life–threatening situations or situations that threaten the safety of themselves, their fellow fire fighters and members of the public. The fire fighter's inability to exercise good judgment and/or react quickly because he/ she is impaired by drug use could lead to disasterous [sic] results.

We agree with the circuit court that the City's interest in the safety of its fire fighters, their co–workers, and the public they serve is indeed of a compelling nature. *See City of Annapolis v. United Food & Commercial Workers, Local 400*, 317 Md. 544, 563, 565 A.2d 672, 681 (1989) (safety of both police and fire personnel and the public served by them constitute compelling interest of the city).

In our view, the City's interest in safety here is no less compelling than the federal government's safety interest pertaining to Customs Service personnel involved in drug interdiction referred to in *Von Raab* and the covered railway employees in *Skinner*.

### E. Balancing

In balancing Doe's and the fire fighters' privacy expectations against the City's interest regarding the safety of its fire fighters and the public they serve, we conclude, as did the circuit court, that the City's compelling interest outweighs Doe's privacy interest.

As discussed in Part III. C. 1., *supra*, the HFD fire fighters have a diminished expectation of privacy, and the urinalysis drug testing in conjunction with their annual physical examination is

minimally intrusive.  On the other hand, the City here has a compelling interest to ensure that its fire fighters are "physically fit" and have "unimpeachable integrity and judgment," *Von Raab*, 489 U.S. at 670, 109 S. Ct. at 1393, 103 L. Ed. 2d at 705, because

> [f]ire [fighters] are also uniquely charged with duties to respond quickly and effectively at a moment's notice. Impaired abilities caused by drug use may beget delays in responding to fires or other public emergencies.  A few minutes could mark the difference between saving one or several occupants in a building or losing the occupants and/or the structure in a blaze.

*City of Annapolis*, 317 Md. at 562, 565 A.2d at 681.  Because the HFD directly and indirectly regulates the fire fighters' private lives and because the mandatory annual physical examinations include the collection of urine samples, the fire fighters' expectations of privacy here are less than that of the Customs Service employees in *Von Raab*.  However, the governmental interests in this case and in *Von Raab* are of comparable weight.  Thus, in balancing the fire fighters' privacy interest against the City's compelling interest, the latter must prevail.

With respect to suspicionless urine drug testing of fire fighters, in the balancing of fire fighters' privacy interests against governmental interests, the post–*Von Raab* and *Skinner* cases generally hold that the latter outweighs the former. *See American Fed'n of Gov't Employees, Local 1533 v. Cheney*, 754 F. Supp. 1409 (N.D. Cal. 1990) (Department of Navy civilian fire fighters); *Plane v. United States*, 750 F. Supp. 1358 (W.D. Mich. 1990) (civil fire fighters of Defense Logistics Agency of the Department of Defense); *City of Annapolis, supra* (fire fighters of City of Annapolis).

Doe relies heavily on *Beattie v. City of St. Petersburg Beach*, 733 F. Supp. 1455 (M.D. Fla. 1990), which held that the city's suspicionless drug testing program for fire fighters contravened

the Fourth Amendment. In *Beattie,* the court concluded that the city's interest was not compelling because the city had no evidence of drug use by fire fighters either on or off duty and no history of accidents attributable to drug use by fire fighters. The court ignored, however, the admonition in *Von Raab* that the fact that "all but a few of the employees tested are entirely innocent of wrongdoing does not impugn [a] program's validity." 489 U.S. at 674, 109 S. Ct. at 1395, 103 L. Ed. 2d at 708.

Accordingly, we conclude that the HFD's Program implementing suspicionless drug testing of Doe's and his fellow fire fighters' urine in conjunction with their annual physical examinations does not infringe upon their rights under the Fourth Amendment.

## IV. SEARCH UNDER THE HAWAII CONSTITUTION

Article I, section 7 of the Hawaii Constitution provides in part:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated[.]

Like the HPD's drug testing program, the HFD's Program is a search under article I, section 7. *McCloskey,* 71 Haw. at 578, 799 P.2d at 958.

Doe contends that the HFD's suspicionless drug testing of his urine specimen constitutes an unreasonable search under the Hawaii Constitution. Based on our analysis of *McCloskey,* we conclude that the HFD's Program does not violate article I, section 7.

In *McCloskey,* the HPD instituted a drug testing program requiring police officers to submit to urinalysis "on either a random, frequent, or regular basis, depending on the officer's duties." 71 Haw. at 570, 799 P.2d at 955. Because police officers were

subjected to regulations affecting their non–professional lives, including rules prohibiting illegal use of drugs when off–duty, the supreme court found that they had a diminished expectation of privacy. The court concluded that the interests served by the drug testing program were the protection of both public and police safety and the preservation of the HPD's integrity and ability to perform its police function. Upon balancing the competing interests of the police officers and the HPD, the supreme court determined that the "HPD's need to conduct its suspicionless drug testing program outweigh[ed] the privacy interest of the police officers." 71 Haw. at 579, 799 P.2d at 959. Citing *Von Raab*, the supreme court stated that its "interpretation of the state guaranty of freedom from unreasonable searches therefore conforms to the interpretation of the analogous federal guaranty." *Id.*

In Part III, *supra*, applying the principles enunciated in *Von Raab* and *Skinner*, we determined that (1) the privacy expectations of Doe and the HFD fire fighters were diminished, (2) the City's interest relating to the safety of fire fighters and the public they served was compelling, and (3) the City's compelling interest outweighed the fire fighters' privacy concerns. Thus, having followed the procedure utilized in *McCloskey*, we conclude that the HFD's Program is a reasonable search and does not infringe upon Doe's and the fire fighters' rights under article I, section 7.

Doe argues, however, that the facts in *McCloskey* differ from those in this case. Consequently, Doe asserts that *McCloskey* is not applicable. We disagree.

In the federal arena, the courts have not limited the application of the *Von Raab* and *Skinner* principles and rationale to drug testing of Customs Service employees and railroad workers. The federal courts have applied *Von Raab* and *Skinner* to suspicionless drug testing of other work forces. *See* Part III. B., *supra*. Similarly, we find nothing in *McCloskey* that restricts its application to drug testing of police officers. We believe that the precepts

followed in *McCloskey* are applicable in determining whether the suspicionless drug testing of fire fighters or any other governmental work force constitutes a reasonable search under article I, section 7.

Doe impliedly argues that the fire fighters' expectation of privacy is not as diminished as that of police officers and that the governmental interest involved in the suspicionless drug testing of fire fighters is not as compelling as that of the police officers in *McCloskey*. This argument is one of degree. We agree with the federal cases holding that the privacy intrusion of drug testing and the compelling governmental interests need not be equivalent to those found in *Von Raab* and *Skinner*. For example, despite the fact that the diminution of privacy expectations and the safety interest involving motor vehicle operators transporting passengers may not be equivalent to those involving the *Von Raab* Customs Service employees interdicting drug trafficking or carrying firearms, the random urine drug testing of the motor vehicle operators was upheld in *Yeutter, supra*.

The same rationale applies in our evaluation of drug testing programs under local law. Accordingly, *McCloskey* is applicable in the analysis and determination of the validity of the HFD's Program under article I, section 7 of the Hawaii Constitution.

## V.  RIGHT TO PRIVACY UNDER THE UNITED STATES CONSTITUTION

"Although '[t]he Constitution does not explicitly mention any right of privacy,' the [United States Supreme] Court has recognized that one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.' " *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684, 97 S. Ct. 2010, 2016, 52 L. Ed. 2d 675, 684 (1977) (quoting *Roe v. Wade*, 410 U.S. 113,

152, 93 S. Ct. 705, 726, 35 L. Ed. 2d 147, 176 (1973)). Doe contends that this federal right of privacy protects fire fighters from drug testing. This contention is without merit.

The Supreme Court has stated that the constitutionally protected privacy interests are "the individual interest in avoiding disclosure of personal matters, and . . . the interest in independence in making certain kinds of important decisions[,]" *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S. Ct. 869, 876, 51 L. Ed. 2d 64, 73 (1977) (footnotes omitted), basically in the privacy areas involving "family, marriage, or procreation[.]" *Bowers v. Hardwick*, 478 U.S. 186, 191, 106 S. Ct. 2841, 2844, 92 L. Ed. 2d 140, 146 (1986). We are unaware of any reported case holding that the suspicionless drug testing of a urine specimen contravenes a person's "right of personal privacy" as protected by the United States Constitution. Rather, the cases involve a Fourth Amendment analysis of urine drug testing programs. *See Von Raab*; *Skinner.*

Doe failed to cite any cases in support of his contention, other than *Beattie, supra.* In *Beattie*, the district court based its ruling regarding drug testing of fire fighters' urine solely on the Fourth Amendment.

We conclude that the HFD's drug testing Program does not infringe upon Doe's and his fellow fire fighters' "right of personal privacy" under the United States Constitution.

## VI. RIGHT TO PRIVACY UNDER THE HAWAII CONSTITUTION

Article I, section 6 of the Hawaii Constitution provides in part:

> The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest.

Doe contends that the HFD's Program violates Doe's and his fellow fire fighters' right to privacy under article I, section 6. We disagree.

The identical issue was raised in *McCloskey*, which is dispositive of this case. In *McCloskey*, the supreme court held that the right of privacy under article I, section 6 protects "the individual's interest in avoiding disclosure of personal matters . . . [and] in freely making certain kinds of important personal decisions." 71 Haw. at 574, 799 P.2d at 957 (citation omitted). The scope of privacy protected encompasses those covered in " '*Griswold*, *Eisenstadt*, and *Roe*[.]' "[5] 71 Haw. at 574–75, 799 P.2d at 957 (quoting *State v. Mueller*, 66 Haw. 616, 626, 671 P.2d 1351, 1358 (1983)). However, the court did "not decide whether compelled urinalysis testing might implicate a right to privacy under the state constitution . . . because . . . the HPD testing program [was] the necessary means to a compelling state interest." 71 Haw. at 575–76, 799 P.2d at 957.

Likewise, in this case, as discussed above, the HFD's Program is also "the necessary means to a compelling state interest." Accordingly, we conclude that the HFD's Program does not violate Doe's and the fire fighters' right of privacy under article I, section 6.

## VII. CONCLUSION

The HFD's Program implementing suspicionless drug testing by urinalysis, conducted in the course of a fire fighter's annual physical examination, does not violate the United States

---

[5] *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), dealt with contraception. *Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972), also involved contraception. *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), dealt with abortion.

Constitution or the Hawaii Constitution. We therefore affirm the final judgment of the circuit court.

Affirmed.

*Jack F. Schweigert* (*Jeff L. Hossellman* with him on the briefs) for plaintiff–appellant.

*Jonathan Chun* (*Cheryl K. Okuma–Sepe* with him on the briefs), Deputies Corporation Counsel, for defendant–appellee.