**ANCHORAGE POLICE DEPARTMENT EMPLOYEES ASSOCIATION, and International Association of Fire Fighters, Local 1264, Appellants and Cross–Appellees,**

v.

**MUNICIPALITY OF ANCHORAGE, Appellee and Cross–Appellant.**

**Nos. S–8137, S–8138 and S–8208.**

Supreme Court of Alaska.

June 15, 2001.

Rehearing Denied July 20, 2001.

---

William B. Aitchison, Aitchison & Vick, Portland, Oregon, for Appellant/Cross–Appellee Anchorage Police Department Employees Association.

Charles A. Dunnagan and Mike L. Dishman, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellant/Cross–Appellee International Association of Fire Fighters, Local 1264.

James D. Gilmore and Amy R. Ménard, Gilmore & Doherty, Anchorage, for Appellee/Cross–Appellant Municipality of Anchorage.

Before MATTHEWS, Chief Justice, EASTAUGH, and BRYNER, Justices.

## OPINION

PER CURIAM.

### I. INTRODUCTION

The superior court found constitutionally valid a policy adopted by the Municipality of

Anchorage (Municipality) that subjects police and fire department employees in safety-sensitive positions to suspicionless substance abuse testing in certain situations—upon job application, promotion, demotion, or transfer, and after a traffic accident—and at random. The Anchorage Police Department Employees Association (Police Employees) and the International Association of Fire Fighters, Local 1264 (Fire Fighters) appeal. We affirm all but one aspect of the superior court's ruling, concluding that the Municipality's at random testing provision violates the Alaska Constitution's prohibition against unreasonable searches and seizures.

## II. FACTS AND PROCEEDINGS [1]

In September 1994 the Municipality adopted Policy No. 40–24 ("the policy"). The policy provides for substance abuse testing, by urinalysis,[2] of certain municipal employees (1) upon employment application, promotion, demotion, or transfer; (2) following a vehicular accident; (3) on reasonable suspicion; and (4) at random. All employees are subject to post-accident testing. Only employees in "public safety positions" are subject to random testing and to promotion/demotion/transfer testing. A public safety position is defined as "a position in the Police or Fire Department having a substantially significant degree of responsibility for the safety of the public where the unsafe performance of an incumbent could result in death or injury to self or others."

Police Employees and Fire Fighters notified the Municipality that they believed that suspicionless testing is unconstitutional. In June 1996 they filed actions for declaratory judgment and injunctive relief, arguing that testing without reasonable suspicion (and without a warrant) violates their members' state and federal constitutional rights to privacy and against unreasonable searches and seizures.[3]

On consolidated motions for summary judgment, the superior court determined that the Municipality's policy is constitutional. The superior court declined to award attorney's fees to the Municipality, finding that Police Employees and Fire Fighters were public interest litigants. Police Employees and Fire Fighters appeal the substance of the superior court's decision; the Municipality cross-appeals the denial of attorney's fees and costs.

## III. STANDARDS OF REVIEW

 We review a grant of summary judgment de novo,[4] drawing all reasonable factual inferences in favor of the non-moving party[5] and affirming the trial court's ruling when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[6] On questions of law, we are not bound by the lower court's decision and will adopt the rule of law that is "most persuasive in light of precedent, reason, and policy."[7] We review a decision regarding attorney's fees/public-interest-litigant status for abuse of discretion.[8]

## IV. DISCUSSION

### A. Suspicionless Substance Abuse Testing

Police Employees and Fire Fighters mount their challenge to the Municipality's suspicionless testing policy along four consti-

1. The background facts are uncontroverted; we distill our factual summary from the superior court's opinion.

2. The policy also provides for testing, under certain circumstances, by breath or saliva. Because these provisions are not directly at issue here, we need not expressly address them.

3. Thereafter, in October 1996, the Municipality implemented the policy on a limited basis. Fire Fighters members were subjected to all but the random testing provisions and Police Employees members were subjected to testing on reasonable suspicion.

4. See Nielson v. Benton, 903 P.2d 1049, 1052 (Alaska 1995).

5. See Wright v. State, 824 P.2d 718, 720 (Alaska 1992).

6. See Voigt v. Snowden, 923 P.2d 778, 781 (Alaska 1996).

7. Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

8. See Eyak Traditional Elders Council v. Sherstone, Inc., 904 P.2d 420, 423 (Alaska 1995).

tutional fronts.[9] They contend that the policy violates the right to privacy and the prohibition against unreasonable searches and seizures; they press each of these theories under the Alaska and United States Constitutions. The superior court's thorough and thoughtful decision on summary judgment addressed each of these claims but placed primary emphasis on the alleged violations of Alaska's constitutional right to privacy.[10] For the reasons explained below, however, we prefer to resolve the parties' arguments using the analytical framework that governs unlawful searches and seizures; and although we find substantial guidance in cases interpreting the United States Constitution, we limit our decision to the requirements of the Alaska Constitution's search and seizure clause.

Article I, section 14, of the Alaska Constitution prohibits unreasonable searches and seizures: "The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, section 22, defines Alaska's right to privacy: "The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section."

We have held that both of these provisions afford broader protection than their federal counterparts. Alaska's guaranty of privacy is broader than the protection found in the federal constitution, which contains no express privacy provision:

Since the citizens of Alaska, with their strong emphasis on individual liberty, enacted an amendment to the Alaska Constitution expressly providing for a right to privacy not found in the United States Constitution, it can only be concluded that the right is broader in scope than that of the Federal Constitution.[11]

And Alaska's search and seizure clause is stronger than the federal protection because article I, section 14 is textually broader than the Fourth Amendment,[12] and the clause draws added strength from Alaska's express guarantee of privacy.[13] Because the Alaska Constitution provides broader protection to Police Employees and Fire Fighters under both constitutional theories that they argue in this appeal, we need only determine whether the Municipality's policy violates the Alaska Constitution's requirements. Thus, we base our ultimate ruling exclusively on the Alaska Constitution.

Moreover, while the parties raise legitimate constitutional concerns under both the privacy and search and seizure clauses of the Alaska Constitution, we think it best to focus our decision on article I, section 14—the search and seizure provision. In prior opinions, this court has emphasized that the primary purpose of both Alaska provisions—section 14's search and seizure protection and section 22's privacy guaranty—is to protect "personal privacy and dignity against unwarranted intrusion by the State, or other governmental officials."[14] Accordingly, in cases involving allegedly invalid searches, we have recognized that the standard for determining compliance with Alaska's search and seizure clause is "inexorably entwined" with the standard of privacy established in article

---

9. The parties do not dispute the portions of the policy that allow testing based upon reasonable suspicion.

10. We attach Judge Hunt's decision to this opinion as Appendix A and adopt the decision's comprehensive factual findings for purposes of our opinion.

11. *Ravin v. State,* 537 P.2d 494, 514–15 (Alaska 1975) (Boochever, J., and Connor, J., concurring); *see also Messerli v. State,* 626 P.2d 81, 83 (Alaska 1980).

12. *See Ellison v. State,* 383 P.2d 716, 718 (Alaska 1963).

13. *See State v. Jones,* 706 P.2d 317, 324 (Alaska 1985); *Schultz v. State,* 593 P.2d 640, 642 (Alaska 1979); *State v. Daniel,* 589 P.2d 408, 416–18 (Alaska 1979); *State v. Glass,* 583 P.2d 872, 879 (Alaska 1978), *modified on other grounds, City of Juneau v. Quinto,* 684 P.2d 127, 129 (Alaska 1984); *Zehrung v. State,* 569 P.2d 189, 199 (Alaska 1977); *Woods & Rohde, Inc. v. State, Dep't of Labor,* 565 P.2d 138, 150–51 (Alaska 1977).

14. *Schultz,* 593 P.2d at 642 (quoting *Weltz v. State,* 431 P.2d 502, 506 (Alaska 1967)) (internal quotation marks omitted).

I, section 22.[15]

The Municipality policy at issue here requires Police Employees and Fire Fighters members to submit to urinalysis for purposes of disclosing potential substance abuse. The United States Supreme Court has held that urine testing conducted under analogous circumstances qualifies as a "search" for constitutional purposes:

> Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment.[16]

Because the policy at issue here unquestionably requires employees to submit to "searches," and because Alaska's search and seizure clause incorporates the requirements of Alaska's privacy clause, we can resolve all of the constitutional issues raised in this case by applying the analytical framework governing Alaska's search and seizure provision, article I, section 14. If the disputed policy passes muster under this analysis, it will necessarily also satisfy the requirements of article I, section 22, as well as the corresponding, but more lenient, demands of the United States Constitution.

The United States Supreme Court has decided four cases addressing the validity, under the Fourth Amendment, of suspicionless substance abuse testing requirements analogous to those challenged here.

In *Skinner v. Railway Labor Executives' Ass'n*,[17] the Court upheld Federal Railroad Administration (FRA) regulations that required railroads to administer breath and urine tests to all employees involved in accidents and that authorized railroads to test employees upon reasonable suspicion and after violations of safety rules.[18] The Court held that the testing regulations were constitutional, noting that the railroad industry is pervasively regulated,[19] that the challenged regulations were designed to deter drug and alcohol use,[20] that requiring individualized suspicion would unduly interfere with the railroad's ability to obtain information concerning accident causes,[21] and that the regulations contained adequate safeguards to prevent abuses of discretion by supervisors.[22] Thus, the Court ruled that the compelling governmental interest in protecting public safety outweighed railroad employees' privacy concerns.[23]

In *National Treasury Employees Union v. Von Raab*,[24] a case decided the same day as *Skinner*, the Court considered regulations that subjected United States Customs Service employees to suspicionless testing upon promotion to (or application for) positions directly involving the interdiction of illegal drugs or positions that required carrying a firearm. Unlike the railroad employees in *Skinner*, the Customs Service employees in *Von Raab* had no history of drug and alcohol abuse problems.[25] The Court nonetheless found the regulations to be constitutionally reasonable, noting that Customs Service employees were in the unique position of having easy access to contraband, becoming the targets of bribes, and maintaining national secu-

---

**15.** *Woods & Rohde*, 565 P.2d at 151.

**16.** *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

**17.** 489 U.S. at 602, 109 S.Ct. 1402.

**18.** *See id.* at 609–11, 109 S.Ct. 1402.

**19.** *See id.* at 627, 109 S.Ct. 1402.

**20.** *See id.* at 630, 109 S.Ct. 1402. The Court noted that "[b]y ensuring that employees in safety-sensitive positions know they will be tested upon the occurrence of a triggering event, the timing of which no employee can predict with certainty, the regulations significantly increase the deterrent effect of the administrative penalties associated with the prohibited conduct." *Id.*

**21.** *See id.* at 631, 109 S.Ct. 1402.

**22.** *See id.* at 622 n. 6, 109 S.Ct. 1402.

**23.** *See id.* at 633, 109 S.Ct. 1402.

**24.** 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

**25.** *See id.* at 673–74, 109 S.Ct. 1384; *see also id.* at 680–81, 109 S.Ct. 1384 (Scalia, J., dissenting).

rity.[26] The Court thus upheld the testing requirement as justified by "special needs":

The Government's compelling interests in preventing the promotion of drug users to positions where they might endanger the integrity of our Nation's borders or the life of the citizenry outweigh the privacy interests of those who seek promotion to these positions, who enjoy a diminished expectation of privacy by virtue of the special, and obvious, physical and ethical demands of those positions.[27]

In *Vernonia School District 47J v. Acton,*[28] the Court upheld a school district policy that required random drug tests of all students wishing to participate in interscholastic athletic activities.[29] In reaching its decision, the Court emphasized that the state has "custodial and tutelary" power over public schoolchildren.[30] Further, the Court noted, student athletes have a lesser expectation of privacy because often they are required to "suit up" before practices and events in public locker rooms, undergo a physical exam, carry adequate health insurance, and maintain a minimum grade point average.[31] Relying on evidence indicating that these students encountered particularly high physical risks from drug use, the *Vernonia* Court concluded that the governmental interest in deterring drug use among student athletes was compelling, whereas the intrusion on their privacy was minimal.[32] The Court thus approved the testing requirement, but cau-

tioned "against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts." [33]

More recently, in *Chandler v. Miller,*[34] the Court held that a Georgia statute requiring candidates for state office to certify that they had tested negative for illegal drugs violated the Fourth Amendment. The Court reasoned that the requirement "does not fit within the closely guarded category of constitutionally permissible suspicionless searches." [35] Reviewing its past decisions on suspicionless drug testing, the Court noted that the Georgia law did not deal with a pervasively regulated industry or with a group that had a demonstrated substance abuse problem, as in *Skinner;* that elective office holders in Georgia were not intimately involved in drug interdiction, as in *Von Raab;* and that they had little in common with student athletes entrusted to the government's care, as in *Vernonia.* Finding no special need for suspicionless drug testing, the Court found Georgia's symbolic interest in fighting illegal drugs insufficient to permit deviation from the Fourth Amendment's usual requirements of a warrant supported by probable cause.[36]

And most recently, in *Ferguson v. City of Charleston,*[37] the Court ruled unconstitutional a hospital's suspicionless drug-testing policy. Under the policy at issue in *Ferguson,* a public hospital in Charleston, with assistance from South Carolina law enforcement author-

26. *See id.* at 669, 109 S.Ct. 1384. *But cf. Chandler v. Miller,* 520 U.S. 305, 321, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (noting that *Von Raab* was "[h]ardly a decision opening broad vistas for suspicionless searches [and] must be read in its unique context").

27. *Von Raab,* 489 U.S. at 679, 109 S.Ct. 1384. Due to an inadequate record, the Court declined to decide whether suspicionless drug testing was constitutional when applied to Customs Service employees who sought to be transferred or promoted to a position where they would handle "classified" information. *See id.*

28. 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

29. *See id.* at 648–50, 115 S.Ct. 2386. The District also tested athletes at the beginning of the season for their sport. *See id.* at 650, 115 S.Ct. 2386.

30. *Id.* at 655, 115 S.Ct. 2386.

31. *See id.* at 657, 115 S.Ct. 2386.

32. *See id.* at 658–61, 115 S.Ct. 2386. The Court thought it significant that the District only tested for drugs-not for other physical conditions-and did not test for punitive purposes. *See id.* at 658, 115 S.Ct. 2386.

33. *Id.* at 665, 115 S.Ct. 2386.

34. 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997).

35. *Id.* at 309, 117 S.Ct. 1295.

36. *See id.* at 319–22, 117 S.Ct. 1295.

37. —— U.S. ——, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001).

ities, devised a policy of subjecting pregnant patients to suspicionless urine testing for cocaine if they met certain profile criteria.[38] A central requirement of the policy was that hospital personnel would notify the police of patients who tested positive; those patients were arrested and threatened with prosecution unless they submitted to substance abuse education or treatment.[39] In concluding that this policy violated the requirements of the Fourth Amendment, the Court emphasized that a special need that justifies testing in the absence of probable cause and a warrant must be "one divorced from the State's general interest in law enforcement"—that is, a special need could not be found to exist when the "direct and primary purpose" of testing patients was *the specific purpose of incriminating those patients.*" [40]

In considering the validity of suspicionless testing in the foregoing cases, the Supreme Court applied a "special needs" [41] test that Justice Scalia aptly summarized in *Vernonia:*

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness." At least in a case such as this, where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard " 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of

legitimate governmental interests.' " Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant. Warrants cannot be issued, of course, without the showing of probable cause required by the Warrant Clause. But a warrant is not required to establish the reasonableness of *all* government searches; and when a warrant is not required (and the Warrant Clause therefore not applicable), probable cause is not invariably required either. A search unsupported by probable cause can be constitutional, we have said, "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." [42]

As this passage from *Vernonia* recognizes, the "special needs" test establishes a balance between the "individual's Fourth Amendment interests" and "legitimate governmental interests." In applying this balance, the *Vernonia* Court divided its consideration of the individual's Fourth Amendment interests into two components: (1) the nature of the privacy interest at issue-or the scope of the individual's reasonable expectation of privacy; and (2) the character of the disputed intrusion.[43] Considering the first component, reasonable expectation of privacy, the *Vernonia* Court focused on the factual context of the search at issue, as well as its legal context, that is, the legal relationship between

38. *See id.* at 1285.

39. *See id.*

40. *Id.* at 1292.

41. The Supreme Court described the genesis of its "special needs" test in *Ferguson:*

> The term "special needs" first appeared in Justice Blackmun's opinion concurring in the judgment in *New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). In his concurrence, Justice Blackmun agreed with the Court that there are limited exceptions to the probable-cause requirement, in which reasonableness is determined by "a careful balancing of governmental and private interests," but concluded that such a test should only be applied "in those exceptional circumstances in which special needs, beyond

the normal need for law enforcement, make the warrant and probable-cause requirement impracticable...." This Court subsequently adopted the "special needs" terminology in *O'Connor v. Ortega,* 480 U.S. 709, 720, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion), and *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), concluding that, in limited circumstances, a search unsupported by either warrant or probable cause can be constitutional when "special needs" other than the normal need for law enforcement provide sufficient justification.

*Ferguson,* —— U.S. at ——, 121 S.Ct. at 1286 n. 7 (some internal citations omitted).

42. 515 U.S. at 652–53, 115 S.Ct. 2386 (internal footnote and citations omitted).

43. *See id.* at 654–60, 115 S.Ct. 2386.

the state and the individuals to be searched.[44] Considering the second component, degree of intrusion, the Court recognized that urine testing implicated these privacy interests: the privacy of the tested individual's excretory function and the privacy of the information revealed by the testing process.[45] Reviewing these primary factors, the *Vernonia* Court concluded that student athletes would reasonably expect a significant degree of intrusion upon their privacy rights and that the degree of intrusion involved in the disputed urine tests was "not significant." [46]

The *Vernonia* Court then turned to the government's interest in testing student athletes, closely examining "the nature and immediacy of the governmental concern at issue." [47] Finding the nature of the state's interest "compelling" [48] and the need for protection immediate,[49] the Court drew the balance in favor of suspicionless testing: "Taking into account all the factors we have considered above—the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search—we conclude Vernonia's Policy is reasonable and hence constitutional." [50]

In reaching this conclusion, the Court expressly rejected the notion that a testing regime based on reasonable suspicion might be a viable, less intrusive alternative. Among the Court's reasons for finding reasonable suspicion testing impracticable, the foremost was its fear that a suspicion-based regime might actually prove more intrusive:

"[P]arents who are willing to accept random drug testing for athletes are not willing to accept accusatory drug testing for all students, which transforms the process into a badge of shame." [51] Hence, the Court concluded, "[i]n many respects, ... testing based on 'suspicion' would not be better, but worse." [52]

In the present case, the superior court adopted the Supreme Court's "special needs" analysis as a guide for its own application of the Alaska Constitution's protection against unreasonable searches and seizures. Rejecting the argument that a warrantless search must be deemed per se unreasonable under article I, section 14,[53] the court saw "the remaining question" to be "whether the search occasioned by suspicionless drug and alcohol testing is unreasonable." [54]

Because it found no relevant definition of "reasonable" under Alaska law, the superior court proceeded to apply a case-by-case balancing analysis modeled on the "special needs" test articulated in *Skinner, Von Raab,* and *Vernonia.* The court noted—correctly, we think—that "[t]his analysis is similar to the one applied to the right to privacy issues." [55] Incorporating its earlier privacy analysis,[56] the superior court upheld the Municipality's suspicionless testing policy as constitutionally reasonable under article I, section 14, and the Fourth Amendment.[57]

In challenging the superior court's reasonableness determination, Fire Fighters and Police Employees rely heavily on the tradi-

44. *See id.* at 654–57, 115 S.Ct. 2386.

45. *See id.* at 658–60, 115 S.Ct. 2386.

46. *Id.* at 657, 660, 115 S.Ct. 2386.

47. *Id.* at 660–64, 115 S.Ct. 2386.

48. *Id.* at 661, 115 S.Ct. 2386.

49. *Id.* at 663, 115 S.Ct. 2386.

50. *Id.* at 664–65, 115 S.Ct. 2386.

51. *See id.* at 663, 115 S.Ct. 2386.

52. *Id.* at 664, 115 S.Ct. 2386 (footnote omitted).

53. *See* Appendix A at 34–38.

54. *Id.* at 38.

55. *Id.*

56. In upholding the Municipality's policy under article I, section 22, the superior court applied the balancing test articulated by this court in *Ravin v. State,* 537 P.2d 494, 498 (Alaska 1975). The superior court described the test as follows:
First, the court must determine the nature of the plaintiff's rights, if any, infringed upon by the state's action. Second, the court must resolve the question of whether the infringement is justified by determining (1) whether there is a proper governmental interest in imposing the restriction and (2) whether the means chosen bear a close and substantial relationship to the governmental interest.
*See* Appendix A at 15.

57. *See id.*

tional presumption that a search conducted without a warrant supported by probable cause is per se unreasonable.[58] In particular, Police Employees insists that the Municipality's policy is invalid because it "does not fall within any of the standard exceptions to the warrant requirement for a search and seizure."

■ Yet our case law expressly recognizes that neither the warrant requirement nor the requirement of probable cause invariably governs searches occurring in the context of a heavily regulated activity.[59] And as the superior court properly recognized here, "special needs" findings are especially appropriate when employment occurs "in a highly regulated, safety-essential field of work."[60] Workers employed in such fields necessarily expect reduced privacy in their job-related activities and implicitly agree to a diminished level of privacy when they accept employment.

Fire Fighters nevertheless question whether firefighting is a heavily regulated activity, insisting that "Fire Fighters are not pervasively regulated *for safety*." (Emphasis added.) But in our view, the superior court was not clearly erroneous in finding that covered members of both Police Employees and Fire Fighters are subject to extensive safety regulations. And in any event, whether firefighters are pervasively regulated "for safety" is beside the point. For as the Sixth Circuit recently concluded in rejecting an argument similar to the Fire Fighters' argument here, "this view is simply not supported by the relevant authority.... [The] cases

demonstrate that the entire focus of the regulations need not be on the employees themselves, or relate to safety per se, in order for the industry to be considered heavily regulated."[61] More pertinent, in our view, is that members of Police Employees and Fire Fighters undeniably hold safety-sensitive positions in extensively regulated fields of activity where they "discharge duties fraught with risks of injury to others that even a momentary lapse of attention can have disastrous consequences."[62] We believe that workers in such positions would reasonably expect that their conditions of employment would subject them to exceptionally close scrutiny.

Police Employees and Fire Fighters further allege that, even if the policy's provisions for suspicionless testing are not per se invalid, the superior court applied an improper privacy analysis in concluding that the policy meets article I, section 14's requirement of reasonableness. Insisting "that its members have a reasonable expectation of privacy in the collection and testing of their urine," Police Employees contends that the Municipality lacks a sufficiently compelling interest to override this privacy interest and that suspicionless urinalysis fails to provide a "close and substantial" means of meeting the Municipality's interest. Fire Fighters echoes these arguments, emphasizing its view that there can be no compelling need for suspicionless testing without proof of an existing substance abuse problem:

> The central objection which the Fire Fighters have to this policy is not one premised upon the intrusiveness of twenty-

**58.** *Cf. State v. Myers*, 601 P.2d 239, 241 (Alaska 1979) (stating that "a warrantless search will be considered per se unreasonable unless it falls within a previously recognized exception to the warrant requirement").

**59.** *See Woods & Rohde, Inc. v. State, Dep't of Labor*, 565 P.2d 138, 151–52 & n. 69 (Alaska 1977) (relaxing probable cause requirement for administrative searches of commercial premises under state workplace safety statutes and recognizing that warrant requirements would also be relaxed in context of heavily regulated activity, but declining to relax requirement because the premises searched were not engaged in heavily regulated industry); *see also Nathanson v. State*, 554 P.2d 456, 458–59 (Alaska 1976) (holding that commercial crabbers "had no protectable federal

or state constitutional interest" in the contents of their crab pots, because "[c]ommercial crabbing is closely regulated by the State").

**60.** *See, e.g., National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (holding that when employees' duties depend on judgment and dexterity, they cannot reasonably expect to keep from their employer information bearing directly on their fitness).

**61.** *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 382–83 (6th Cir.1998).

**62.** *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 628, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

first century technology or medical science. It is not being subjected to the indignity of compelled urination. It is an objection which has its genesis in the two hundred year old Fourth Amendment: *They do not, as individuals or as a group, have a drug problem.* There is no "compelling need" which justifies divergence from the Fourth Amendment's main rule that searches must be made pursuant to individualized suspicion.

We find that these arguments are unpersuasive. In *Messerli v. State*[63] we explained that the right to privacy is not absolute, but is subject to balancing against conflicting rights and interests. We concluded that, where a fundamental right is involved, the state must show a compelling state interest justifying its abridgement.[64] More recently we reiterated the *Messerli* test in the following way:

(1) does the party seeking to come within the protection of the right to [privacy] have a legitimate expectation that the materials or information will not be disclosed?

(2) is disclosure nonetheless required to serve a compelling state interest?

(3) if so, will the necessary disclosure occur in that manner which is least intrusive with respect to the right to [privacy]? [65]

■ This test eschews absolute measures of privacy; it prescribes the same kind of flexibility that the Supreme Court described in *Vernonia:*

It is a mistake, however, to think that the phrase "compelling state interest," in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a compelling state interest here? Rather, the phrase describes an interest which appears *important enough* to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy.[66]

The touchstone of a compelling state interest, then, is simply that "[the] right [to privacy] must yield when it interferes in a serious manner with the health, safety, rights and privileges of others or with the public welfare." [67]

We therefore decline to hold that a history of substance abuse problems is invariably necessary to establish a "special need" for suspicionless testing in situations involving heavily regulated, safety-sensitive job duties.[68]

■ Applying the flexible *Messerli* standard to the case at hand, moreover, we hold that the superior court did not err, for the most part, in concluding that a "special need" for testing existed here. The superior court found that the Municipality's interest in en-

63. 626 P.2d 81 (Alaska 1980).

64. *See id.* at 84.

65. *Alaska Wildlife Alliance v. Rue*, 948 P.2d 976, 980 (Alaska 1997) (alteration in original) (quoting *Jones v. Jennings*, 788 P.2d 732, 738 (Alaska 1990)).

66. 515 U.S. 646, 661, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

67. *Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975).

68. We note that the Supreme Court reached the same conclusion in *Von Raab*, where the Court upheld suspicionless testing of certain Customs Service employees based on the nature of their duties, despite the absence of any documented drug abuse problem among Service employees:

Because successful performance of their duties depends uniquely on their judgment and dex-

terity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness. While reasonable tests designed to elicit this information doubtless infringe some privacy expectations, we do not believe these expectations outweigh the Government's compelling interests in safety and in the integrity of our borders.

*Von Raab*, 489 U.S. at 672, 109 S.Ct. 1384 (internal citations omitted). We do not read *Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) to conflict with this proposition in stating that *"Von Raab* must be read in its unique context." 520 U.S. at 321, 117 S.Ct. 1295. To the contrary, *Chandler* recognizes that the "special needs" test requires a case-by-case examination of the duties performed by the employees to be tested. In our view, the duties of police officers and firefighters fall far closer to those of Customs Service employees than those of elected public officials.

suring public safety is sufficiently compelling to outweigh the relatively modest—though admittedly not insignificant—intrusion on privacy that occurs under the disputed Municipality policy when Police Employees and Fire Fighters members are subjected to suspicionless urine testing upon application for employment, upon promotion, demotion or transfer, or after a vehicular accident. We agree with these findings.[69] We further agree with the superior court's finding that the Municipality's policy reflects a close and substantial means-to-end fit in these situations.[70] In such cases, then—cases when suspicionless testing occurs upon application for employment, upon promotion, demotion or transfer, and after vehicular accidents— we conclude that the balance of individual versus governmental interests tips decidedly in the Municipality's favor.[71]

In our view, however, the balance shifts in the case of an indefinite requirement of random testing.[72] The policy's provision for ongoing random urinalysis testing alters the "special needs" balance between individual privacy interests and competing governmental interests in at least three significant ways.

First, random testing places increased demands on employees' reasonable expectations of privacy. Because the policy's provision for random testing could subject employees to "unannounced" probing throughout the course of their employment, the tests are peculiarly capable of being viewed as "unexpected intrusions on privacy." [73] For example, it might seem manifestly unreasonable for any person applying for a safety-sensitive position in a heavily regulated field of activity not to anticipate—and implicitly agree to—a

**69.** Although the parties dispute whether the "special need" asserted in this case to justify the disputed policy-public safety-is sufficiently compelling to withstand constitutional scrutiny, there is no dispute that this need qualifies as a "need divorced from the State's general interest in law enforcement." *See Ferguson v. City of Charleston,* — U.S. at —, 121 S.Ct. 1281, 1289, 149 L.Ed.2d 205 (2001).

**70.** As the Supreme Court noted in *Vernonia,* the proposed alternative of suspicion based testing may well be impracticable and, indeed, counterproductive. *See Vernonia,* 515 U.S. at 664, 115 S.Ct. 2386.

**71.** In so concluding, we note that suspicionless testing regimes in comparable situations have been upheld by an overwhelming majority of courts in other jurisdictions. *See, e.g., Hatley v. Department of Navy,* 164 F.3d 602 (Fed.Cir.1998) (firefighters); *Knox County Educ. Ass'n v. Knox County Bd. of Educ.,* 158 F.3d 361 (6th Cir.1998) (school teachers); *Aubrey v. School Bd. of Lafayette Parish,* 148 F.3d 559 (5th Cir.1998) (school custodians); *Bluestein v. Skinner,* 908 F.2d 451 (9th Cir.1990) (airline industry personnel); *Taylor v. O'Grady,* 888 F.2d 1189 (7th Cir.1989) (correctional officers in regular contact with inmates); *National Fed'n of Fed. Employees v. Cheney,* 884 F.2d 603 (D.C.Cir.1989) (Army's civilian aviation personnel, police, and guards); *Thomson v. Marsh,* 884 F.2d 113 (4th Cir.1989) (chemical weapons plant workers); *Guiney v. Roache,* 873 F.2d 1557 (1st Cir.1989) (police officers carrying firearms or engaged in drug interdiction efforts); *Policemen's Benevolent Ass'n of New Jersey v. Washington Township,* 850 F.2d 133 (3d Cir.1988) (police officers); *Rushton v. Nebraska Pub. Power Dist.,* 844 F.2d 562 (8th Cir.1988) (nuclear power plant engineers); *Smith v. Fresno*

*Irrigation Dist.,* 72 Cal.App.4th 147, 84 Cal. Rptr.2d 775 (1999) (construction and maintenance workers); *McCloskey v. Honolulu Police Dep't,* 71 Haw. 568, 799 P.2d 953 (1990) (police officers); *Doe v. City of Honolulu,* 8 Haw.App. 571, 816 P.2d 306 (1991) (firefighters); *City of Annapolis v. United Food & Commercial Workers Local 400,* 317 Md. 544, 565 A.2d 672 (App.Ct. 1989) (police officers and firefighters); *New Jersey Transit PBA Local 304 v. New Jersey Transit Corp.,* 151 N.J. 531, 701 A.2d 1243 (1997) (transit police officers); *Caruso v. Ward,* 72 N.Y.2d 432, 534 N.Y.S.2d 142, 530 N.E.2d 850 (1988) (police officers in elite anti-narcotics unit); *Boesche v. Raleigh–Durham Airport Auth.,* 432 S.E.2d 137 (N.C.App.1993) (airport authority maintenance mechanics); *but see Guiney v. Police Comm'r of Boston,* 411 Mass. 328, 582 N.E.2d 523 (1991) (police officers).

**72.** As originally proposed in September 1994, Municipality Policy/Procedure 40–24 called for random testing without prior notice. Employees were to be contacted and escorted to the collection site by a supervisor; testing would occur throughout the year; safety-sensitive employees would be subject to testing on multiple occasions; and testing for drugs would "not have to be conducted in immediate time proximity to performing job functions." Although the Municipality's October 1995 amended policy omitted the random testing provisions of P & P 40–24 pending court review, the Municipality has stated that "[i]t remains MOA's intent … to include 'public safety' employees in random testing if such testing is found to be constitutional."

**73.** *Von Raab,* 489 U.S. at 672 n. 2, 109 S.Ct. 1384.

probing inquiry into the applicant's capacity to perform job-related duties; the same would hold true for any employee who might be promoted, demoted, transferred, or become involved in a job-related accident. But a job applicant or employee who anticipated such inquiries might nevertheless expect not to be subjected to a continuous and unrelenting government scrutiny that exposes the employee to unannounced testing at virtually any time. Such expectations cannot be so readily dismissed as patently unreasonable.

Second, random testing is more intrusive: it subjects employees to a greater degree of subjective intrusion. An unannounced test's added element of "fear and surprise," [74] and its "unsettling show of authority," [75] make random testing qualitatively more intrusive than testing that is triggered by predictable, job-related occurrences such as promotion, demotion, and transfer. Moreover, an ongoing requirement of random testing is more intrusive because its reach is broader than that of a requirement that attaches upon application, promotion, or transfer. In distinguishing the facts of its prior "special needs" cases from those involved in the hospital testing situation at issue in *Ferguson v. City of Charleston*, the Supreme Court commented that "[t]he use of an adverse test result to disqualify one from eligibility for a particular benefit, such as a promotion or an opportunity to participate in an extracurricular activity, involves a less serious intrusion on privacy than the unauthorized dissemination of such results to third parties." [76] Of course, the Court made this comment in passing, and the testing regime challenged in

*Ferguson* bears no similarity to the policy at issue here. But the Court's reference to the reduced intrusiveness of tests designed to determine eligibility for "a particular benefit" nonetheless evinces its recognition that suspicionless testing requirements become progressively more intrusive as they place increasingly valuable rights in jeopardy.

Third, a requirement of random testing impacts the balance between individual and governmental interests by reducing the immediacy of the government's need for the disclosed information. Unlike suspicionless testing occasioned by application, promotion, demotion, transfer, or vehicular accident, the policy's random test provision has no logical nexus to any job-related occurrence. Particularly in the absence of a documented history of substance abuse, then, the Municipality can claim no immediate, job-contextual need to know the results of a randomly drawn urinalysis; it can only claim a more attenuated, institutional interest in checking.

Considering these subtle yet significant attributes of random testing, we conclude that the Municipality has failed to meet its burden of establishing a special need for its random testing provision. In so concluding, we note that the United States Supreme Court has never approved an open ended random-testing regime like the one at issue here. [77] Indeed, *Von Raab* spoke favorably of a suspicionless testing regime that applied only upon transfer or promotion precisely *because* it lacked a random, unannounced component:

Indeed, these procedures significantly minimize the program's intrusion on privacy interests. Only employees who have been

---

74. *City of Indianapolis v. Edmond*, 531 U.S. 32, ——, 121 S.Ct. 447, 458, 148 L.Ed.2d 333 (2000) (Rehnquist, J., dissenting).

75. *Von Raab*, 489 U.S. at 672 n. 2, 109 S.Ct. 1384.

76. —— U.S. at ——, 121 S.Ct. 1281, 1288, 149 L.Ed.2d 205 (2001).

77. In *Skinner*, the Court upheld suspicionless testing for railway workers involved in accidents and safety-related violations. 489 U.S. at 607–11, 109 S.Ct. 1402. In *Von Raab* the Court approved suspicionless testing for applicants seeking promotion or transfer to certain Customs Service positions. 489 U.S. at 679, 109 S.Ct. 1384. *Vernonia* is the only case in which the

Court has considered a random testing provision. Although the *Vernonia* Court upheld a random test requirement for high school students, the record in that case established the existence of a drug problem among students that had reached crisis levels. *See* 515 U.S. at 660–62, 115 S.Ct. 2386. Moreover, the random testing regime that the *Vernonia* Court approved applied only to a limited class of students (those who chose to participate in interscholastic athletics), and only during seasons of active competition. *See id.* at 650–51, 115 S.Ct. 2386. Finally, the *Vernonia* Court identified as the "most significant element in this case" the school system's unique role "as guardian and tutor of children entrusted to its care." *Id.* at 665, 115 S.Ct. 2386.

tentatively accepted for promotion or transfer to one of the three categories of covered positions are tested, and applicants know at the outset that a drug test is a requirement of those positions. Employees are also notified in advance of the scheduled sample collection, thus reducing to a minimum any "unsettling show of authority." [78]

And notably, at least one federal circuit court has expressly relied on the absence of a random testing component as a basis for approving a suspicionless testing policy.[79]

It is thus uncertain whether the policy's random testing provision would pass muster under the Fourth Amendment. But we need not speculate on this issue. Because we address the policy's validity under the more protective requirements of the Alaska Constitution, we conclude on the present record—which reveals no documented history of substance abuse problems among Police Employees or Fire Fighters members and fails to establish that the policy's goals will not be adequately addressed by its remaining suspicionless testing provisions—that the random testing provision is unreasonable and therefore violates article I, section 14 of the Alaska Constitution.

### B. *Public Interest Litigant Status*

■ On cross-appeal, the Municipality argues that the trial court abused its discretion by finding that Police Employees and Fire Fighters were public interest litigants and by failing to award attorney's fees to the Municipality on this basis. We reject this argument.

We restated the criteria for determining whether a party is a public interest litigant in *Valley Hospital Ass'n v. Mat–Su Coalition for Choice:*

(1) the case effectuates a strong public policy,

(2) numerous people will benefit from the litigation,

(3) only a private party could be expected to bring the action, and

(4) the party would not have sufficient economic incentive to bring the lawsuit even if the action involved only narrow issues lacking general importance.[80]

The Police Employees and the Fire Fighters satisfy each criterion.

The trial court did not clearly err when it determined that this litigation was brought to

---

**78.** *Von Raab,* 489 U.S. at 672 n. 2, 109 S.Ct. 1384 (quoting *Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

**79.** *See Knox County Educ. Ass'n v. Knox County Bd. of Educ.,* 158 F.3d 361, 384 (6th Cir.1998). The *Knox County* court stated:

> On balance, the public interest in attempting to ensure that school teachers perform their jobs unimpaired is evident.... These public interests clearly outweighed the privacy interests of the teacher.... *This is particularly so because it is a one-time test, with advance notice and with no random testing component,* and because the school system in which the employees worked is heavily regulated, particularly as to drug use.

*Id.* (emphasis added).
We do recognize that many other courts have upheld suspicionless testing policies that include random testing components. *See, e.g., Hatley v. Department of Navy,* 164 F.3d 602 (Fed.Cir.1998) (firefighters); *Aubrey v. School Bd. of Lafayette Parish,* 148 F.3d 559 (5th Cir.1998) (school custodians); *Bluestein v. Skinner,* 908 F.2d 451 (9th Cir.1990) (airline industry personnel); *National Fed'n of Fed. Employees v. Cheney,* 884 F.2d 603 (D.C.Cir.1989) (Army's civilian aviation personnel, police, and guards); *Thomson v. Marsh,* 884

F.2d 113 (4th Cir.1989) (chemical weapons plant workers); *Guiney v. Roache,* 873 F.2d 1557 (1st Cir.1989) (police officers carrying firearms or engaged in drug interdiction efforts); *Policemen's Benevolent Ass'n of New Jersey v. Washington Township,* 850 F.2d 133 (3d Cir.1988) (police officers); *Rushton v. Nebraska Pub. Power Dist.,* 844 F.2d 562 (8th Cir.1988) (nuclear power plant engineers); *Smith v. Fresno Irrigation Dist.,* 72 Cal.App.4th 147, 84 Cal.Rptr.2d 775 (1999) (construction and maintenance workers); *McCloskey v. Honolulu Police Dep't,* 71 Haw. 568, 799 P.2d 953 (1990) (police officers); *Doe v. City of Honolulu,* 8 Haw.App. 571, 816 P.2d 306 (1991) (firefighters); *New Jersey Transit PBA Local 304 v. New Jersey Transit Corp.,* 151 N.J. 531, 701 A.2d 1243 (1997) (transit police officers); *Caruso v. Ward,* 72 N.Y.2d 432, 534 N.Y.S.2d 142, 530 N.E.2d 850 (1988) (police officers in elite antinarcotics unit); *Boesche v. Raleigh Durham–Airport Auth.,* 432 S.E.2d 137 (N.C.App.1993) (airport authority maintenance mechanics); *but see Guiney v. Police Comm'r of Boston,* 411 Mass. 328, 582 N.E.2d 523 (1991) (police officers). But none of these cases independently discuss or consider the validity of random testing requirements.

**80.** 948 P.2d 963, 972 n. 21 (Alaska 1997).

effectuate a strong public policy regarding the privacy interests of Alaskan citizens and the constitutional limitations on search and seizure. When litigants seek to effect strong policies like those affecting privacy interests, they benefit all Alaskans, satisfying the second criterion—that numerous people benefit from the litigation. The Municipality does not contest that only a private party could be expected to bring this action, thus satisfying the third criterion. Finally, the Municipality's speculation that economic incentives motivated the Fire Fighters and Police Employees to bring this action is without merit. While the Municipality raises the possibility that individual Police Employees and Fire Fighters could lose their jobs due to drug use detected under the Municipality's policy, the Fire Fighters and Police Employees, as employee groups, have no economic interest in the litigation. Moreover, the two groups asserted that their interests in pursuing constitutional limitations on suspicionless drug testing significantly outweigh individual economic interests in departments with no history of pervasive drug abuse. The trial court so held, and we agree.

We therefore conclude that the superior court did not abuse its discretion in finding Police Employees and Fire Fighters to be public interest litigants.

## V. CONCLUSION

Except as to the random testing provision, we AFFIRM the superior court's ruling upholding the validity of the disputed Municipality policy. We also AFFIRM the trial court's conclusion that Police Employees and Fire Fighters are public interest litigants. As to the random testing policy, we REVERSE for the reasons stated in this opinion.

MATTHEWS, C.J., dissents.

COMPTON and FABE, JJ., not participating.

MATTHEWS, Chief Justice, dissenting.

I agree with Judge Hunt's thorough and carefully reasoned opinion which upholds the right of the Municipality of Anchorage to randomly test police and firefighters for drug use. I have but little to add to her opinion.

Cases supporting suspicionless random drug testing of public employees whose work affects the public safety include the following: *Hatley v. Department of Navy*, 164 F.3d 602 (Fed.Cir.1998) (firefighters); *Aubrey v. School Board of Lafayette Parish*, 148 F.3d 559 (5th Cir.1998) (school custodians); *Bluestein v. Skinner*, 908 F.2d 451 (9th Cir.1990) (airline industry personnel); *Taylor v. O'Grady*, 888 F.2d 1189 (7th Cir.1989) (correctional officers in regular contact with inmates); *Thomson v. Marsh*, 884 F.2d 113 (4th Cir.1989) (chemical weapons plant workers); *National Federation of Federal Employees v. Cheney*, 884 F.2d 603 (D.C.Cir. 1989) (Army's civilian aviation personnel, police, and guards); *Guiney v. Roache*, 873 F.2d 1557 (1st Cir.1989) (police officers carrying firearms or engaged in drug interdiction efforts); *Policemen's Benevolent Ass'n of New Jersey, Local 318 v. Washington Township*, 850 F.2d 133 (3rd Cir.1988) (police officers); *Rushton v. Nebraska Public Power District*, 844 F.2d 562 (8th Cir.1988) (nuclear power plant engineers); *Smith v. Fresno Irrigation District*, 72 Cal.App.4th 147, 84 Cal.Rptr.2d 775 (1999) (construction and maintenance workers); *McCloskey v. Honolulu Police Department*, 71 Haw. 568, 799 P.2d 953 (1990) (police officers); *Doe v. City and County of Honolulu*, 8 Haw.App. 571, 816 P.2d 306 (1991) (firefighters); *New Jersey Transit PBA Local 304 v. New Jersey Transit Corp.*, 151 N.J. 531, 701 A.2d 1243 (1997) (transit police officers); *Caruso v. Ward*, 72 N.Y.2d 432, 534 N.Y.S.2d 142, 530 N.E.2d 850 (1988) (police officers in elite anti-narcotics unit); *Boesche v. Raleigh–Durham Airport Authority*, 111 N.C.App. 149, 432 S.E.2d 137 (1993) (airport authority maintenance mechanics). By contrast, only one case decided since the United States Supreme Court's decision in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), *Guiney v. Police Commissioner of Boston*, 411 Mass. 328, 582 N.E.2d 523 (1991), supports the conclusion reached in today's opinion that the privacy interests of

police or firefighters preclude random testing.[1]

Both *Guiney* and today's opinion call for a showing that there is a "documented history of substance abuse problems among Police Employees and Fire Fighters members" as a precondition for random tests.[2] Other courts have recognized, however, that "police departments have not been immune from the drug use that has affected other workplaces."[3] The absence of a documented drug problem within the police and fire departments should not logically negate the validity of the Municipality's testing program.[4]

The majority appears to believe that public safety will not suffer if the Municipality's random drug testing program is dispensed with.[5] I would defer to the Municipality's public safety administrators on this point, for they are the experts on the realities of law enforcement work, the difficulties of identifying drug usage by law enforcement personnel, and the hazards created by drug-impaired public safety employees. Concerning these points, it has been recognized that identifying drug abuse among employees who operate largely outside the immediate supervision of their superiors presents significant difficulties for municipalities.[6] As a result, numerous jurisdictions have found random testing necessary based on the ineffectiveness of alternative methods of detecting drug use by police and fire personnel.[7] The difficulty of recognizing narcotics usage among public safety employees without random testing will, I fear, ensure that random testing will only be justified to the court's satisfaction after one or more drug-related accidents. In my opinion, the risk to public safety inherent in this approach outweighs the modest privacy interests prejudiced by on-the-job drug testing. Accordingly, I dissent.

## APPENDIX A *

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

### THIRD JUDICIAL DISTRICT AT ANCHORAGE

ANCHORAGE POLICE DEPARTMENT EMPLOYEES ASSOCIATION and ROB HEUN,

 Plaintiffs,

 vs.

MUNICIPALITY OF ANCHORAGE,

 Defendant.

---

1. *See New Jersey Transit,* 701 A.2d at 1254–55 (noting that "[p]ost *Skinner/Von Raab* cases that have considered challenges to random drug testing programs under the Fourth Amendment and parallel state constitutional provisions have generally upheld [such] testing," and relegating the *Guiney* case to *"but see"* status).

2. Slip Op. at 559; *see Guiney,* 582 N.E.2d at 525 (noting that record offered nothing to show existence of a drug problem in Boston Police Department).

3. *New Jersey Transit,* 701 A.2d at 1259 (citing Joseph F. Dietrich & Janette Smith, *The Nonmedical Use of Drugs Including Alcohol Among Police Personnel: A Critical Literature Review,* 14 J. Police Science & Admin. 300, 300–03 (1986)).

4. *See, e.g., Von Raab,* 489 U.S. at 674, 109 S.Ct. 1384 ("Where ... the possible harm against which the government seeks to guard is substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal."); *Harmon v. Thornburgh,* 878 F.2d 484, 487

(D.C.Cir.1989); *City and County of Honolulu,* 816 P.2d at 313 (citing *Harmon*).

5. *See* Slip Op. at 558, 559–560.

6. *See Von Raab,* 469 U.S. at 674, 109 S.Ct. 1384 ("Detecting drug impairment on the part of [such] employees can be a difficult task, especially where, as here, it is not feasible to subject employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments.").

7. *See, e.g., McCloskey,* 799 P.2d at 958–59 (noting impossibility of detecting drug use by police officers through observation and individualized investigations); *City and County of Honolulu,* 816 P.2d at 315 (noting ineffectiveness of detecting drug use by fire fighters through observation, psychomotor tests, and cognitive tests); *Caruso,* 534 N.Y.S.2d 142, 530 N.E.2d at 855 (citing statistics concerning ineffectiveness of drug testing predicated upon reasonable suspicion).

* Minor editorial changes have been made to the superior court's decision in compliance with the

INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, LOCAL 1264, and JOSEPH ALBRECHT,

 Plaintiffs,

vs.

MUNICIPALITY OF ANCHORAGE,

 Defendant.

Case No. 3AN 96 4880 CI
Case No. 3AN 96 5063 CI
(Consolidated)

*DECISION AND ORDER: CROSS MOTIONS FOR SUMMARY JUDGMENT*

These consolidated cases were brought by the Anchorage Police Department Employees Association (APDEA) and its president, Rob Heun, (Case No. 3AN 96 4880 CI) and the International Association of Fire Fighters, Local 1264, (IAFF) and its president, Joseph Albrecht, (Case No. 3AN 96 5063 CI). Plaintiffs challenge the constitutionality of the substance abuse testing policy adopted by the Municipality of Anchorage (Municipality) and seek to permanently enjoin implementation of those portions of the policy which permit testing in the absence of reasonable suspicion. APDEA is the bargaining unit for non-supervisory members of the Anchorage Police Department. IAFF is the exclusive bargaining unit for non-supervisory members of the Anchorage Fire Department.

Both APDEA and IAFF filed motions for summary judgment on grounds that provisions of the substance abuse testing policy which permit testing in the absence of reasonable suspicion violate employees' right to privacy under the Alaska State Constitution, Article I, Section 22, and employees' right to be free from unreasonable search and seizure under the Alaska State Constitution, Article I, Section 14. APDEA and IAFF also ask the court to declare the provisions to be in violation of the United States Constitution.[1] The Municipality filed cross-motions for summary judgment on grounds that the policy does not violate the privacy or the search and seizure provisions of either the state or federal constitutions.

## I. BACKGROUND

### A. *Municipal Policy No. 40 24*

In September 1994, the Municipality adopted Policy No. 40 24 (hereinafter "the policy"),[2] which establishes mandatory substance abuse testing procedures for many municipal employees. Municipality Exhibits D & E.[3] The policy provides for testing upon application, promotion, transfer, or demotion, following a vehicular accident, upon reasonable suspicion, and pursuant to a random selection procedure. The policy was amended in October 1995 as a result of negotiations with municipal unions.[4]

The policy was not immediately implemented in either the Fire or Police Departments. However, on April 12, 1996, the Municipality sent a notice to all covered employees advising that as of May 15, 1996, they would be subject to testing upon promotion. Municipality Exhibit G, 4 12 96 letter from Thomas Tierney. APDEA and IAFF advised the Municipality that they believed suspicionless substance abuse testing was a violation of employees' constitutional rights and subsequently filed these actions. In October 1996, the Municipality actually began testing by implementing only the reasonable suspicion provisions for the Police Department and implementing all but the random testing provision for the Fire Department. Municipality Exhibit O, 10/24/96 letter to AFD Chief Nolan from Thomas Tierney and 10 29 96 letter to APD Chief O'Leary from Tierney.

---

supreme court's technical guidelines for publication.

1. The APDEA also raised substantive and procedural due process claims in its complaint, but failed to address these theories in its briefing. These arguments are not before the court in these motions.

2. See Appendix to this decision for the policy in its entirety.

3. The policy was adopted as part of the implementation of Policy No. 40 22 (adopted June, 1991) which attempts to address the problem of substance abuse in the municipal workplace.

4. APDEA participated in these negotiations, but IAFF chose not to take part. IAFF's claim of unfair labor practices as a result of the implementation of the policy is not before the court on these motions.

## B. Challenged Testing Provisions

At issue in these cases are the portions of the policy which provide for testing (1) upon promotion, transfer, or demotion, (2) post-accident,[5] and (3) randomly.

### 1. Testing upon promotion, transfer, or demotion

Policy language appears to require substance abuse testing as the final step in the selection process for public safety positions even for employees transferred, promoted or demoted from another public safety position.[6] Policy §§ 7.a.(1) & 7.c.(1)-(2). According to the Municipality, promotion or demotion triggers testing for employees moving from a public safety position; however, transfer testing is triggered only when an employee changes from one position within a job classification which is not subject to testing to another position in the same job classification which is subject to testing. Affidavit of Charles Shelton at ¶ 3.

### 2. Post Accident Testing

The policy also requires testing when an employee is involved in a motor vehicle accident while performing job duties if the accident results in a moving violation, serious injury, or property damage. Policy §§ 7.a.(3), 7.c.(4).[7]

### 3. Random testing

The policy also calls for periodic, unannounced, random testing of employees in public safety positions. Policy §§ 5.v, 7.a.(2), 7.c.(6).[8] A designated independent

---

**5.** The IAFF does not oppose testing after a work-related accident involving a vehicle. IAFF Memo at 4.

**6.** Section 7.a.(1) of the policy describes under what circumstances an employee is subject to promotion/transfer/demotion testing. (This section also governs pre-employment testing which the parties do not challenge.)

> Pre Employment drug and alcohol testing is the final step in the selection process for safety-sensitive and public safety positions. Pre-employment testing may result from any of the following employment actions:
> — New Hire
> — Rehire
> — Promotion
> — Demotion
> — Transfer
> — Reinstatement
> — Re-employment
> . . . .
> Employees in safety-sensitive or public safety positions will be required to re-test for transfer, promotion, or demotion unless this requirement is waived by the Director because an employee has passed a substance abuse exam within the last thirty days.

**7.** Section 7.a.(3) requires testing under the following circumstances:

> Post Accident Testing–Unless waived by the Employee Relations Department, post-accident testing will be conducted when there has been a work related vehicular accident. The procedures for post-accident tests are outlined in 7.c.(4).

> Section 7.c.(4) lists the circumstances that will trigger post-accident testing.

> Post accident testing may be conducted when there has been a work related accident occurring while an employee is performing job duties that results in: a citation for a moving violation; death or personal injury; damage to Municipal or private property excluding the vehicle; or a vehicle being towed from the scene of the accident or removed from service. In any of these circumstances, any employee who is directly involved in the incident shall be subject to the specific criteria set forth below, being tested for drugs and/or alcohol. The first priority will be treatment of any injuries and cooperation with law enforcement personnel. Post-accident testing will be done within 8 hours of the accident and drug testing must be completed within 32 hours after the accident.
> . . . .
> NOTE: If the accident resulting in damage to Municipal or private property was caused by a public safety employee, operating within standard operating policy guidelines, the requirement for post accident testing may be waived by a Command Officer.
> . . . .

**8.** The policy originally adopted by the Municipality in September 1994 included random testing for public safety employees. Municipality's Exhibit D, Policy No. 42 24 at 3 & 22 23, §§ 5.t & 7.c.(7). This provision was not included in the amended policy adopted in October 1995. However, if random testing is found to be constitutionally permissible, the Municipality intends to conduct such testing of all public safety employees. As Carol Smith, the Affirmative Action and Compliance Manager in the Department of Employee Relations with the Municipality, whose job includes Drug Free Workplace Act compliance duties, explains:

percentage of the public safety employees are chosen for alcohol and drug testing on an irregular basis. The employees are chosen randomly and are not given advance notice. No discretion is vested in any supervisor.

### C. Employees Required to Undergo Testing

Although all employees are subject to post-accident testing, only employees in "public safety positions" are subject to random testing and to promotion/transfer/demotion testing. The policy defines a "public safety position" as "a position in the Police or Fire Department having a substantially significant degree of responsibility for the safety of the public where the unsafe performance of an incumbent could result in death or injury to self or others."[9] Policy § 5(t). An overwhelming majority of the members of APDEA and IAFF hold jobs which are classified as "public safety positions."[10] Police Department "public safety position" job classifications were made at a meeting on March 15, 1996, attended by members of the APD, including then-Deputy Police Chief Duane Udland, and members of the Municipal Em-

ployees Relation Department, including Employment Manager Charles Shelton. Fire Department "public safety position" job classifications were also made in the spring of 1996 by Fire Chief James Nolan and members of the Municipal Employee Relations Department. Following are the general job classifications and duties designated as "public safety positions."

### POLICE DEPARTMENT:

*Police Sergeant; Senior Police Detective; Patrol Officer/Warrant Officer:* Sworn officers whose duties include responding to emergencies, performing rescue operations, arresting and transporting suspects. Officers carry firearms, may use force and may operate vehicles at excessive speeds. *Community Service Officer:* Positions assist officers at emergency scenes with traffic control. May also be assigned to evidence room where dangerous weapons and drugs are kept.

*Police Records Supervisors; Senior Police Clerk; Police Clerk; Communications Clerk III; Communications Clerk I/II:* Police clerk positions may respond to emergency (911) calls. Communication

The Amended Policy 40 24 presently does not address random testing for "public safety" employees. Language including "public safety" employees in random testing was omitted from the amended policy because the MOA intended to implement all other types of testing, prior to the court having the opportunity to review the constitutionality of random testing. The omission was intended to reflect the MOA's position that random testing would not be conducted for APDEA employees absent a court's decision. At no time did I state that the policy would be implemented in any other manner than by its terms.

It remains MOA's intent, however, to include "public safety" employees in random testing if such testing is found to be constitutional. Affidavit of Carol Smith at 5 ¶ 14, 15.

Section 5.v of the amended policy defines a random test (italicized language is added from the original policy):

*Random Test*-an unannounced substance abuse test given periodically to Transit and other employees who are required by government regulations to be subject to random testing, *and individuals in public safety positions subject to random testing.*

Section 7.a.(2) sets out the requirement of random drug testing and to whom the testing applies:

*Random testing* is only applicable to certain Transit Department employees, employees required to have a DCL, other employees required by government regulations to be subject to random testing, *and individuals in public safety positions.*

Once each month, the Contractor will randomly select the appropriate percentage of employees, determined by the Employee Relations Department, employed in safety-sensitive/*public safety* positions to be tested. The selection will be performed through use of a statistically valid computer random selection method.

9. The policy also discusses "safety-sensitive" positions. There are no safety-sensitive position[s] within the Police Department. Affidavit of Carol Smith at 4, ¶ 11. Nor do there appear to be any safety-sensitive positions within the Fire Department.

10. 427 out of 437 APDEA members are employed in positions designated as "public safety positions." APDEA Response at 3; Supplemental Affidavit of Rob Heun at 2, ¶ 2. All but three job classifications for IAFF members are considered "public safety positions." Municipality Memo re: IAFF S.J. at 7; Municipality's Exhibit U.

clerk positions may dispatch and route police units.

*Identification Specialist; Identification Technician; Assistant Identification Specialist; Property and Evidence Specialist; Property and Evidence Technician:* Positions involved in the collection, preservation, and storage of weapons, drugs, and blood/tissue evidence.

The positions of Crime Prevention Specialist, Data System Specialty Clerk, Speciality Clerk, and Police Messenger are not designated as public safety positions.

*FIRE DEPARTMENT:*

*Fire Fighter/EMT; Fire Fighter/Paramedic:* Positions respond to fire and medical emergencies, combat fire, administer medical care, and perform rescue operations.

*Fire Apparatus Engineers:* Position responds to fire and medical emergencies, operate emergency vehicles, operate support apparatus (i.e. pumps, hoses, ladders), and perform maintenance on emergency equipment.

*Fire Captain; Senior Fire Captain; Paramedic Supervisor; Fire Battalion Chief:* Positions conduct and supervise responses to emergency operations and may be required to perform fire fighter and paramedic functions in emergencies.

*Fire Investigators; Fire Inspectors:* Positions conduct criminal investigations, inspect complex fire response systems and building construction for code violations.

*Fire Training Specialist:* Position responsible for all areas of emergency training and serve as supplemental safety officers during major emergencies.

*Fire Dispatcher; Fire Lead Dispatcher:* Positions receive and route emergency (911) calls.

*Fire Mechanics; Fire Lead Mechanics:* Positions inspect and repair all response apparatus, respond to major emergencies to service and maintain the equipment during response operations.

The positions of Fire Office Assistant, Fire Senior Office Assistan[t], and Fire Office Associate are not classified public safety positions.

Plaintiffs have not challenged the designation of these jobs as "public safety positions." Therefore, the court will assume as a factual matter that each of the designated "public safety positions" entails a "substantially significant degree of responsibility for the safety of the public where the unsafe performance of an incumbent could result in death or injury to self or others." Policy § 5(t).

D. *Testing Procedures*

The policy sets out testing procedures at length and incorporates current federal Department of Transportation regulations. Policy § 6. Employees report to a collection site to provide a urine sample. The collection site personnel checks an employee's photo identification, and any personal belongings (outer garments, contents of pockets, purses, briefcases, etc.) that the employee wants to take into the testing restroom. The employee is asked to provide a urine sample in a private restroom. The employee is not observed while providing the sample. The collection site personnel then verifies the urine specimen's integrity by checking for sufficient volume, temperature, and the absence of unusual color or sediment. In the presence of the employee, the collection site personnel then pours part of the urine sample into a second container which is preserved for later testing if requested by the employee to verify initial results. The employee then seals and labels the urine specimens in the presence of the collection site personnel.

The sample is sent to the testing lab, where lab personnel verify that the ID on the bottle and chain of custody form match, that there is sufficient volume, and that the tamper proof seal is intact. An initial test is performed. If it yields a positive result, a second test is done via Gas Chromatography Mass Spectroscopy. If this second test also yields a positive result, a "positive test" is reported to the Medical Review Officer. Otherwise, a "negative test" is reported.

The Medical Review Officer reviews the test results and researches reasons for a confirmed positive test. This includes checking with the employee to determine if there

is a legitimate medical explanation for the result such as a prescribed medication. If the Medical Review Officer determines that the positive test result does not have a legitimate medical explanation, the positive result is reported to the designated Employee Relations Representative.

Failure to show up for testing and failure to provide a sample are also reported to the Employee Relations Department.

## II. *DISCUSSION*

The parties agree that the state constitution provides greater individual protection than the federal constitution, so if the policy passes muster under Article I, Sections 14 and 21 of the Alaska Constitution, it is also constitutional under the comparable provisions of the United States Constitution. Therefore, the court will focus its attention on the constitutionality of the challenged portions of the policy under the state constitution.

### A. *Summary Judgment Standards*

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." Alaska Civil Rule 56(c); *see also Whaley v. State*, 438 P.2d 718, 719 720 (Alaska 1968). A genuine issue of fact "exists where reasonable jurors could disagree on the resolution of a factual issue." *McGee Steel Co. v. State ex rel. McDonald Indus. of Alaska, Inc.*, 723 P.2d 611, 614 (Alaska 1986). The court must view all facts in the light most favorable to the non-moving party. *See Clabaugh v. Bottcher*, 545 P.2d 172, 175 n. 5 (Alaska 1976); *Braun v. Alaska Commercial Fishing and Agriculture Bank*, 816 P.2d 140, 142 n. 2 (Alaska 1991). The party opposing summary judgment must set forth specific facts demonstrating that a material issue of fact exists. Civil Rule 56(e); *Howarth v. First Nat'l Bank of Anchorage*, 540 P.2d 486, 489–90 (Alaska 1975), *aff'd on rehearing*, 551 P.2d 934 (Alaska 1976). If, in deciding a motion for summary judgment, the court

must decide questions of law, the court will adopt the rule of law which is most persuasive in light of precedent, reason, and policy. *Ford v. Municipality of Anchorage*, 813 P.2d 654, 655 (Alaska 1991); *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

The parties agree that the issues raised are appropriately resolved by summary judgment because the details of the Municipality's substance abuse testing policy are uncontested (although its implications are not), and the question for the court is a legal one. *See, e.g., American Federation of Government Employees v. Skinner*, 885 F.2d 884, 894–95 (D.C.Cir.1989) (finding summary judgment procedure proper for reviewing constitutionality of drug testing program).

### B. *Does the Testing Policy Violate Employees' Constitutional Right to Privacy Under Article I, Section 22, of the Alaska Constitution?*

#### 1. *Scope of the Right to Privacy*

An individual's right to privacy is specifically protected by Article I, Section 22 of the Alaska State Constitution which provides in part:

The right of the people to privacy is recognized and shall not be infringed.

The right to privacy under the Alaska Constitution is broader and more encompassing than the right to privacy protected under the United States Constitution. *Messerli v. State*, 626 P.2d 81, 83 (Alaska 1980); *Woods & Rohde v. State, Dept. of Labor*, 565 P.2d 138, 148–49 (Alaska 1977); *Ravin v. State*, 537 P.2d 494, 514–15 (Alaska 1975). Although the right to privacy under the United States Constitution is only an inferred right emanating from other enumerated rights, Alaska's constitution explicitly lists privacy as one of the basic rights granted to all Alaskan citizens. *Falcon v. Alaska Public Offices Commission*, 570 P.2d 469, 476 (Alaska 1977). The Alaska Supreme Court has interpreted the right to privacy as extending to the communication of "private matters," "a person's more intimate concerns," "the type of personal information which, if disclosed even to a friend, could cause embarrassment or anxiety." *Doe v. Alaska Superior Court,*

721 P.2d 617, 629 (Alaska 1986) (quoting several prior Alaska cases).

A right to privacy will be recognized where an individual has an actual or subjective expectation of privacy and the expectation is one that society is prepared to recognize as reasonable. *Jones v. Jennings*, 788 P.2d 732, 738 (Alaska 1990). However, the right to privacy is not absolute. *Messerli v. State*, 626 P.2d 81, 83 (Alaska 1980). "When a matter does affect the public, directly or indirectly, it loses its wholly private character, and can be made to yield when an appropriate public need is demonstrated." *Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975), *quoted in Doe v. Alaska Superior Court*, 721 P.2d 617, 630 (Alaska 1986). Thus, the right to privacy "must yield when it interferes in a serious manner with the health, safety, rights and privileges of others or with the public welfare." *Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975).

### 2. *Ravin Balancing Test*

The Alaska Supreme Court has articulated the following test for determining whether a challenged state action violates an individual's right to privacy. First, the court must determine the nature of the plaintiff's rights, if any, infringed upon by the state's action. Second, the court must resolve the question of whether the infringement is justified by determining (1) whether there is a proper governmental interest in imposing the restriction and (2) whether the means chosen bear a close and substantial relationship to the governmental interest.[11] *Ravin v. State*, 537 P.2d 494, 498 (Alaska 1975). Thus, in order to determine whether Plaintiffs have a valid privacy interest that outweighs the Municipality's interest in suspicionless substance abuse testing, the court must answer the following questions:

a. Do employees have a subjective or actual expectation of privacy in the act of urination or in the information that can be disclosed by urinalysis which expectation society is prepared to recognize as reasonable?

b. If so, what is the nature and extent of Police and Fire Department employees' privacy and interest?

c. Does the Municipality have a proper governmental interest in imposing suspicionless substance abuse testing on employees?

d. If so, does suspicionless substance abuse testing bear a close and substantial relationship to the Municipality's proper governmental interest?

### 3. *Applying the Ravin test*

a. *Do employees have a subjective or actual expectation of privacy in the act of urination or in the information that can be disclosed by urinalysis which society is prepared to recognize as reasonable?*

---

11. In *Ravin*, the Court explicitly adopted the "proper government interest"/"close and substantial relationship" test rather than the traditional compelling state interest test for evaluating a right to privacy. *Ravin v. State*, 537 P.2d 494, 498 (Alaska 1975). In *Falcon v. Alaska Public Offices Commission*, 570 P.2d 469, 476 (Alaska 1977), the Court observed that "[u]nder the Alaska Constitution, the required level of justification turns on the precise nature of the privacy interest involved," contrasting this standard with the standard in federal cases of a "compelling state interest." However, in some subsequent privacy cases, the Court has referred to a compelling state interest in weighing the right to privacy against a state interest. *See Jones v. Jennings*, 788 P.2d 732 (Alaska 1990) (inquiring whether disclosure of personnel records was required to serve a compelling state interest as part of test adopted from Colorado case); *Messerli v. State*, 626 P.2d 81 (Alaska 1980) (using compelling state interest test from *Breese v. Smith*, 501 P.2d 159 (Alaska 1972), for impairment of a fundamental right under the Alaska Constitution). In practical terms, there is probably no significant difference between these tests. *See Vernonia School Dist. v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 2394–95, 132 L.Ed.2d 564 (1995) (emphasis in original):

It is a mistake, however, to think that the phrase "compelling state interest," in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a compelling state interest here? Rather, the phrase describes an interest which appears *important enough* to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy.

As evidence of a subjective or actual expectation of privacy on the part of Fire and Police Department employees, Plaintiffs offer the affidavit of APDEA president, Rob Heun:

> Members of the APDEA, including myself, view the act of urination as a private and intimate matter which should not be compelled or witnessed by the Municipality. In addition, members of the APDEA believe that the analysis of their urine or their blood could reveal to the Municipality private matters, including but not limited to the employee's genetic makeup and predisposition to certain types of diseases, whether the employee is suffering from an illness which has no impact on the employee's performance as a Municipal employee, whether the employee is taking medication (such as birth control pills) which has no impact on job performance, what foods the employee has consumed, and other matters which could be disclosed through urine or blood testing which the employee wishes not to be shared with other individuals.

Affidavit of Rob Heun at 10 11, ¶ XXIV. The Municipality does not offer any evidence that members of APDEA and IAFF do not hold this subjective expectation.

Society is prepared to recognize this expectation as reasonable. As the United States Supreme Court stated: "The collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable." *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In reaching this conclusion, the Supreme Court quoted the Fifth Circuit:

> There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed its performance in public is generally prohibited by law as well as social custom.

*Id.* (quoting *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 175 (1987)).

The Alaska Supreme Court has also found that the privacy amendment to the Alaska Constitution "shields the ingestion of food, beverages or other substances." *Gray v. State,* 525 P.2d 524, 528 (Alaska 1974), *quoted in Ravin,* 537 P.2d at 502.

> b. *What is the nature and extent of Fire and Police Department employees' privacy interest?*

Privacy interests deserve varying levels of protection, depending on the precise nature and the extent of the interest. *Falcon v. Alaska Public Offices Commission,* 570 P.2d 469, 476 (Alaska 1977). "Expectations of privacy are not all of the same intensity.... Both subjectively and in society's judgment as to what is reasonable, distinctions may be made in the varying degrees of privacy retained in different places and objects." *State v. Myers,* 601 P.2d 239, 242 (Alaska 1979).[12]

The Alaska Supreme Court has observed that "society often tolerates intrusions into an individual's privacy under circumstances similar to those in urinalysis." *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123, 1135 (Alaska 1989).[13] It concluded that an analysis of the extent of the privacy invasion occasioned by urinalysis should focus on the reason for conducting urinalysis rather than on the conduct of the test. *Id.* at 1135. The court further quoted with approval from Judge Patrick Higgenbotham's analysis in his concurrence in *National Treasury Employees Union v. Von Raab,* 808 F.2d 1057 (5th Cir.1987). Judge Higgenbotham observed that the act of urination required by the testing program involves a lack of privacy similar to that experienced by persons using public toilet facilities and that the information disclosed by urinalysis was not all that different from the background checks and release of medical records required for many government jobs. *Id.* at 1134–35.

Likewise, the Alaska Supreme Court has recognized that an individual may have re-

---

**12.** For example, the privacy interest in personnel records is less compelling than that implicated in home or familial settings. *Jones v. Jennings,* 788 P.2d 732, 738 n. 14 (Alaska 1990).

**13.** *Luedtke* involved a private employer's drug testing program.

duced or no expectation of privacy when involved in an extensively regulated industry. *Woods & Rohde, Inc. v. State, Dept. of Labor,* 565 P.2d 138, 150 (1977) (discussing and interpreting prior holding in *Nathanson v. State,* 554 P.2d 456 (Alaska 1976)). The United States Supreme Court has specifically held that "the privacy expectations of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 627, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Where employees' successful performance of duties is uniquely dependent on the employees' judgment and dexterity, employees "cannot reasonably expect to keep" from their employer "personal information that bears directly on their fitness." *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 672, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

The parties do not dispute that employees of both the Police and Fire Departments have a variety of tests, investigations, and regulations as conditions of employment.

### (i) *The Police Department*

Police Department employees undergo intense scrutiny during the application process. An applicant for a sworn position with the Police Department initially fills out an extensive personal history questionnaire which inquires into the applicant's education, military experience, law enforcement experience, driving history, financial history, criminal history, and alcohol and drug use. Municipality Exhibit I, APD Background Investigator's Manual, Standard Procedures, at 6 7. An applicant who has illegally used or sold controlled substances will usually be eliminated from consideration as will an applicant who has been convicted of driving while intoxicated in the previous five years. *Id.* at 13–14. If an applicant is not eliminated from consideration, an extensive background check is conducted. Previous employers, friends, roommates, spouse, and former spouses are asked about the applicant's character and reputation, criminal history, negative or adverse habits, and any other information that might bear on the applicant's suitability. *Id.* at 17 23. A credit check is also performed. *Id.* at 24. If still under consideration, the applicant undergoes a psychological exam, a polygraph exam, a physical agility test, a medical exam, and drug screening before a final offer of employment is made. *Id.* at 25.

Even applicants for non-sworn police department positions must undergo an extensive background investigation, a psychological exam (requirement added in 1996), and drug screening test (requirement since 1993). Municipality Exhibit J, Vacant Position Announcements for Police Clerk Register and Police Dispatcher Register; Affidavit of Duane Udland.

Once hired, all Police Department employees submit to a biennial physical examination, including a complete urinalysis. Municipality Exhibit K, Agreement By and Between MOA and APDEA at 16 17. APDEA contends that these are voluntary physical exams. It relies on the language in the agreement that the employees are "entitled" to the physical exam, and Rob Heun's affidavit which states the employees' general understanding that the physical exams are voluntary; some employees do not take them; and no one has been disciplined for not taking them. However, the agreement provides that the Municipality could require an examination: [it is] "mandatory that all employees covered by this Agreement shall receive a physical examination as required in this Article." *Id.* at 18. The examining physician does not report any information from the exam or tests to the Police Department unless the physician finds something that "might affect the employee's ability to perform his (sic) duties." *Id.* at 17.

The Police Department also regulates employees' lives both on-duty and off-duty. Employees cannot report to work with the odor of or under the influence of alcohol, may not drink on duty unless required in the performance of official duties, and may not consume intoxicants while in uniform. Municipality Exhibit L, APD Regulations & Procedures Manual §§ 1.02.165, .170, .175.

Off-duty, employees may not consume intoxicants "to the extent that they become discourteous or engage publicly in conduct that reflects adversely on the Department." *Id.* § 1.02.200. Employees must notify their supervisor of any prescription or non-prescription medication that might adversely affect their ability to perform their duties. *Id.* § 1.02.205 (as amended in 1996). Finally, the employees are required to "maintain sufficient physical condition to satisfy the requirements of their assignment." *Id.* § 1.03.210.

#### (ii) *Fire Department*

Fire Department employees are subject to similar intrusions and regulations. Pre-employment physical examinations are required for positions requiring physical fitness. Municipality's Exhibit Q, Vacant Position Announcements. Many of the positions also call for a background check including criminal history, psychological examination, and drug screening. Fire Fighter/EMT and Fire Fighter/Paramedic employees are required to successfully complete the Standard Physical Performance Ability Screen Exercise ("SPASE") in order to be certified as a Fire Fighter. They must re-take the SPASE on a periodic basis including after returning to work following an injury or illness. Affidavit of James Nolan at 2 3, ¶ 4; Municipality Exhibit R, AFD Training Division SPASE Requirements. An annual physical examination is also required although the results are released to the Fire Department anonymously only for statistical purposes. Municipality Exhibit N, Health and Physical Fitness Program § 6.

Both on-duty and off-duty employee behavior is regulated by the Fire Department as well. Employees are subject to dismissal for diminished capacity to work due to alcohol or drugs or lack of sleep from off-duty activities. Municipality Exhibit N, Rules & Regulations of Conduct § 2.3.1. Regulations forbid intoxicating beverages, marijuana, or controlled substances on any Department premises. Tobacco use is strictly limited. Municipality Exhibit N, Safety & Health Program § 3.1.1(44), (51). Regulations limit facial hair and hair cuts. Safety & Health Program § 4. When an employee may wear a uniform or any insignia of the Department duty is also strictly regulated. Rules & Regulations of Conduct §§ 3.1.1(21), (23); Municipality Exhibit N, Uniform Standards. While on duty, employees are required to avoid all religious or political discussions or subjects of controversy while engaged in Fire Department business; they are forbidden from engaging in any malicious gossip, reporting, or activity; and they are strictly prohibited from engaging in any altercation with another employee. Rules & Regulations of Conduct §§ 3.1.1(26), (27), (28). Employees are subject to dismissal for engaging in behavior offensive to the public such as insulting, yelling at, or otherwise alienating the public, and for making gestures deemed to be obscene or discriminatory. Rules & Regulations of Conduct § 2.3.6. Off-duty, employees are prohibited from engaging in any activity that is inconsistent with or detrimental to their duties or service with the Fire Department. Rules & Regulations of Conduct § 3.1.1(18).

The pervasive pre-employment investigations, disclosures, and requirements along with the extension regulation of Police and Fire Department employees, particularly concerning their physical and mental preparedness for their demanding jobs, indicates a diminished expectation of privacy.[14]

The policy testing procedures themselves are designed to minimize further intrusiveness. An employee is permitted to remain clothed in his or her usual attire. Personal items are subject to search only if the em-

---

**14.** Other courts have recognized a diminished expectation of privacy under similar circumstances. *See, e.g., Doe v. City and County of Honolulu,* 8 Haw.App. 571, 816 P.2d 306, 314 (1991) (fire fighters have diminished expectation of privacy); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 672, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (Customs employees involved in the interdiction of illegal drugs or who are required to carry a firearm have diminished expectation of privacy because employees cannot reasonably expect to avoid inquiry into information that reflects directly on their fitness); *Skinner v. Railway Labor Exec. Ass'n,* 489 U.S. 602, 627–28, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (employees in a heavily regulated industry have diminished expectation of privacy where safety is dependent on health and fitness of employees).

ployee insists on taking them into the rest room for the test. The employee is unaccompanied and unmonitored while actually providing the urine sample.[15] The sample is tested only for the prohibited substances.[16] Information on medication the employee is taking need be provided only after a positive test result, and a positive test result based on a permissible medication will not be reported to the Municipality.

Considering the employees' diminished expectation of privacy arising from their employment in a highly regulated, safety-essential field of work, the fairly slight privacy interest in the act of urination required for the testing, and the limited testing done on urine samples, the court finds that the intrusion on Plaintiffs' privacy interests is minimal.

 c. *Does the Municipality have a proper governmental interest in imposing suspicionless substance abuse testing on Fire and Police Department employees?*

The Municipality's stated goals in implementing the substance abuse testing are "deterring drug usage, sale, and/or possession by Municipal employees in the workplace" in order to "ensure a safe, healthful, and productive work environment." Policy No. 40 22 at 1. Plaintiffs assert that the Municipality does not have a proper governmental interest because the Municipality has offered no spe-

cific evidence that there is a problem with substance abuse among employees in either the Fire Department or Police Department.

No evidence has been provided of any specific problem with substance abuse by any employee of the Anchorage Police Department and minimal evidence has been provided concerning the Fire Department.[17]

In similar cases, courts have taken judicial notice of the problems of substance abuse in society and have not required a showing of specific drug and alcohol use among the employees to be tested. For example, in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 674, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), the Supreme Court took notice that "drug abuse is one of the most serious problems confronting our society today. There is little reason to believe that American workplaces are immune from this pervasive social problem." The Court found that "[t]he mere circumstance that all but a few of the employees tested are entirely innocent of wrongdoing does not impugn the program's validity." *Id.* at 676, 109 S.Ct. 1384. The Court concluded that a specific showing of a drug problem in the particular employee group was not necessary: "It is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context." *Id.* at 676, 109 S.Ct. 1384. *See also English v. Talladega County*

---

**15.** Compare *Vernonia School District v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 2393, 132 L.Ed.2d 564 (1995), in which the United States Supreme Court considered the privacy invasion of required urinalysis of student athletes. The Court found that "the privacy interests compromised by the process of obtaining the urine sample are in our view negligible," where the students were permitted to remain fully clothed and were not directly observed while producing a sample. *Id.*

**16.** Other courts have considered it significant that the questioned tests screen only for drugs. *Vernonia School District v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 2393, 132 L.Ed.2d 564 (1995). Here Plaintiffs raise the specter of additional testing of the urine samples to provide information unrelated to safety-considerations. However, the policy allows testing only for specific substances. (The policy incorporates DOT regulations which prohibit testing for anything other than the specified controlled substances. Policy

§§ 6.e.(1) & 6.f.(1); 49 C.F.R. § 40.21(c).) The court will not assume that the Municipality intends to violate the policy. When a party chooses to challenge a policy on its face, the court will not assume the worst. *Vernonia,* 115 S.Ct. at 2394.

**17.** Fire Chief Nolan states in his affidavit that he is aware of several instances where employee drug use has been identified or suspected. He describes two instances where employees were subject to discipline: one employee quit after being disciplined on several occasions for being impaired by alcohol while on duty and one employee was terminated after testing positive for cocaine following discipline for suspicion of repeated marijuana use. He describes a third employee who successfully completed a treatment program and four other employees who were suspected of substance abuse, but who quit prior to any official action being taken. Affidavit of Chief Nolan at 10.

*Board of Education,* 938 F.Supp. 775 (N.D.Ala.1996) (holding that drug testing can be justified in absence of any evidence of drug use in the workforce if drug use is totally incompatible with the nature of the position); *American Federation of Government Employees, AFL–CIO v. Cavazos,* 721 F.Supp. 1361, 1372 (D.D.C.1989) (determining that court could not strike down drug testing program simply for lack of evidence that government agency had experienced a drug problem in the past). In *Doe v. City and County of Honolulu,* 8 Haw.App. 571, 816 P.2d 306, 311 (1991), the Hawaii Court of Appeals found that the trial court had not erred in taking judicial notice "of the fact that use and abuse of illegal drugs is a serious problem in society and that HFD's fire fighters, as members of society, are not immune from this pervasive social problem."

Plaintiffs rely on *Guiney v. Police Commissioner of Boston,* 411 Mass. 328, 582 N.E.2d 523 (1991), in which a closely-divided Massachusetts Supreme Court held that the intrusion of government-mandated drug testing could not be justified absent specific proof of a drug problem in the group of employees being tested.

> In the case before us ... the commissioner has made no demonstration, on the record or otherwise, that facts exist that warrant random drug tests of police officers. The record offers nothing to show that there is a drug problem in the Boston police department. Nor is there anything outside of the record of which he could take note that would permit such a conclusion.
>
> . . . .
>
> The court should not infer or assume the existence of facts that might justify the governmental intrusion. The reasonableness of a mandated urinalysis cannot fairly be supported by unsubstantiated possibilities. If the government is to meet the requirements of [Massachusetts's constitutional search and seizure provision], it must show at least a concrete, substantial governmental interest that will be served by imposing random urinalysis on unconsenting citizens. In such a case, the justi-

fication for body searches, if there ever can be one, cannot rest on some generalized sense that there is a drug problem in this country, in Boston, or in the Boston police department and that random urinalyses of police officers will solve, or at least help to solve, the problem or its consequences. We reject the view of the majority of the Justices of the Supreme Court that such proof is not required because "[i]t is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context." See *National Treasury Employees Union v. Von Raab, supra* 489 U.S. at 675 n. 3, 109 S.Ct. 1384.

The *Guiney* case has not been followed by other courts. It fails to appropriately consider the legitimate goals of substance abuse deterrence and prevention in light of the power vested in the police department and the public's reliance on the individual employee's physical and mental acuity in carrying out both Fire Department and Police Department responsibilities for the public welfare and safety.

Prior to the U.S. Supreme decisions in *Skinner* and *Von Raab,* the Alaska Supreme Court addressed drug testing in the context of private employment. *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123 (Alaska 1989). Although the constitutional right to privacy was not implicated because no state action was involved, the court applied the *Ravin* balancing test finding that it is "analogous to the analysis that should be followed in cases construing the public policy exception to the at-will employment doctrine." *Id.* at 1135. The court observed that work on an oil rig could be very dangerous and found that it was important for oil rig workers to be drug-free on the job in order to protect the safety of other personnel and the oil field. *Id.* at 1136. It then weighed the public policy supporting the employees' privacy in off-duty activities against the public policy supporting the protection of the health and safety of other workers as well as the employees in question, and determined that the health and safety concerns were paramount. *Id.* at 1136. The court did not require a specific showing of a current drug problem among oil rig workers.

The position articulated by the United States Supreme Court in *Von Raab* and the approach taken by the Alaska Supreme Court in *Luedtke* are persuasive on the issue of whether the Municipality must establish specific instances of substance abuse in the workplace before initiating a testing program. Although evidence of specific drug or alcohol abuse problems in the Police or Fire Department would be persuasive of the need for the testing program, the absence of significant statistical or anecdotal evidence of a drug or alcohol problem is not dispositive. The court takes judicial notice that drug and alcohol abuse is a serious problem in society. The court further observes that the use of illegal drugs and abuse of alcohol are incompatible with positions whose duties include "a substantially significant degree of responsibility for the safety of the public where the unsafe performance of an incumbent could result in death or injury to self or others." Policy § 5(t). Further, the workplaces of both the Police Department and the Fire Department are not confined to the stations; their workplace is everywhere in the community that Fire Department and Police Department services are needed. The court concludes that the Municipality has a proper governmental interest, one which is "concerned with the health [or] safety ... of others," *Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975), and that this interest outweighs the Plaintiffs' privacy interest.

> d. *Does suspicionless substance abuse testing bear a close and substantial relationship to the Municipality's proper governmental interest?*

Having found that the Municipality's interest in deterring alcohol and drug usage, sale, and possession in the workplace in order to ensure a safe, healthful, and productive workplace outweighs Fire and Police Department employees' privacy interest, the court must next consider whether the means chosen by the Municipality bear "a close and substantial relationship" to that interest. Plaintiffs contend that the means, suspicionless drug and alcohol testing, do not bear a sufficiently close and substantial relationship. They argue first, that urinalysis is not the

least restrictive means of achieving the Municipality's goals and second, that urinalysis is an unproved method of combatting drug and alcohol abuse.

Plaintiffs suggest that screening for substance abuse could be done at least as well and probably more effectively one of two ways. (1) It would be better if supervisors were trained to recognize signs of substance abuse, and to test only upon reasonable suspicion. (2) Standard sobriety tests (such as the HGN used by police) could be used to establish reasonable suspicion for testing.

The Municipality responds that neither of these methods would necessarily be less intrusive noting that the greater the discretion vested in a supervisor, the greater the potential for selective and discriminatory use of the testing procedures. The Municipality also argues that these alternatives would primarily aid in detecting drug or alcohol use, but would not be a significant aid to the Municipality's other goal of deterring substance abuse.

Courts have not required that the method chosen be the least restrictive one. For example, in *Harrison v. State*, 687 P.2d 332 (Alaska App.1984), the Alaska Supreme Court upheld a local option law permitting communities to prohibit the importation of alcohol into the community. In challenging the law as violative of the right to privacy, Harrison pointed to evidence suggesting that moderate consumption of alcohol may be medically beneficial and contended that moderate users would be improperly punished by the law. The supreme court found that, whatever the medical benefits might be, the harmful effects of alcohol were undisputed, and that increased access to alcohol would undoubtedly increase the number of alcohol abusers. The court then upheld the local option law finding that it bore a close and substantial relationship to the legitimate legislative goal of protecting the public health and welfare by curbing the level of alcohol abuse in the state. The Court did not accept the argument that the prohibition against alcohol in certain communities spread too

broadly, encompassing people who were not problem drinkers.[18]

In *Skinner*, the United States Supreme Court rejected the argument that the government's actions have to be the least restrictive:

> Respondents offer a list of "less drastic and equally effective means" of addressing the Government's concerns, including reliance on the private proscriptions already in force, and training supervisory personnel "to effectively detect employees who are impaired by drug or alcohol use without resort to such intrusive procedures as blood and urine tests." We have repeatedly stated, however, that "[t]he reasonableness of any particular government activity does not necessarily or invariably turn on the existence of alternative 'less intrusive means.' " It is obvious that "[t]he logic of such elaborate less-restrictive-alternatives could raise insuperable barriers to the exercise of virtually all search-and-seizure powers," because judges engaged in post hoc evaluations of government conduct " 'can almost always imagine some alternative means by which the objectives of the [Government] might have been accomplished.' "

489 U.S. 602, 629 n. 9, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). *See Vernonia School District v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 2396, 132 L.Ed.2d 564 (1995) ("We have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."). In the instance case, the court concludes that the method chosen need not be the least restrictive in order to have a close and substantial relationship to the government goals.

The Plaintiffs' second contention is that urinalysis is an unproved method of combatting drug abuse. None of the cases cited by the parties have struck down a program on this basis. IAFF offers the affidavit of Dr. Kurt Dubrowski, a board-certified clinical and forensic toxicologist who, among other qualifications, has served for the last thirty years as State Director of Tests for Alcohol and Drug Influence in Oklahoma. In his affidavit, Dr. Dubrowski points to studies which he contends establish "that random drug testing seldom, if ever, reveals illicit drug use in work populations which have been subject to [mandated drug testing]." Dubrowski Affidavit at 7. He specifically refers to data reported in the November 20, 1996, issue of *Drug Detection Report: The Newsletter on Drug Testing in the Workplace*, in which motor carrier industry employers who tested their employees pursuant to the Omnibus Transportation Employee Testing Act of 1991 reported very small positive rates on drug tests. Dubrowski Affidavit at 7 8.

In contrast, the Municipality offers the affidavit of Peter Bensinger, former Administrator of the Drug Enforcement Agency, who runs a private company providing consultation and services related to promoting a drug-free workplace and employee health and safety. Bensinger reaches a different conclusion from the data showing low "positive" rate for employees tested in the transportation industry. He concludes that the low positive rate results from the deterrent effect of the random drug testing program. Bensinger Affidavit 12/27/96 at 11, ¶ 24. He also points to the 1995 Department of Defense survey of Health Related Behaviors Among Military Personnel in which the Department of Defense reported a dramatic drop in the use of illicit drugs by member of the armed forces since the institution of a mandatory drug testing program. Bensinger Affidavits: 8/26/96 at 5 6, ¶ 10 and Exhibits 1 & 2; 12/27/96 at 11, ¶ 23; 1/27/97 at 5 6, ¶ 12 13.

Having concluded that the requirement of a "close and substantial relationship" is not synonymous with a requirement that the means employed be the least restrictive, this court need not determine as a factual matter that the Municipality has chosen the very best means of preventing substance abuse in the workplace. The Municipality has offered sufficient evidence to establish a close and substantial relationship between its proper governmental interest in deterring alcohol

---

18. *But see Jones v. Jennings*, 788 P.2d 732 (Alaska 1990) (requiring that disclosure of personnel records be done in "least intrusive" manner, utilizing test from Colorado case).

and drug usage, sale, and possession in the Fire Department and Police Department in order to ensure a safe, healthful, and productive workplace and the Municipality's means of suspicionless drug and alcohol testing.

C. *Does the Testing Policy Violate Employees' Constitutional Right to be Free from Unreasonable Search and Seizure Under Article I, Section 14, of the Alaska Constitution?*

Article I, Section 14, of the Alaska Constitution provides:

> The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The protection against unreasonable search and seizure under the Alaska Constitution is broader than the protection of the Fourth Amendment of the U.S. Constitution. *See, e.g., Woods & Rohde, Inc. v. State, Dept. of Labor,* 565 P.2d 138 (Alaska 1977). Plaintiffs contend that suspicionless drug and alcohol tests violate both the Alaska and U.S. Constitutions because the tests are not pursuant to a warrant issued upon probable cause; and even if a warrant is not required, such testing constitutes an unreasonable search. The preliminary question is whether drug and alcohol testing constitutes a search. If it is, should suspicionless drug and alcohol testing be an exception to the warrant requirement, and if so, is such a search unreasonable?

1. *Do the procedures for collecting urine samples and the urinalysis constitute a search?*

The United States Supreme Court has concluded that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, and therefore, must be deemed searches under the Fourth Amendment. *Skinner v. Railway Labor Executives Association,* 489 U.S. at 617, 109 S.Ct. 1402. This conclusion is equally applicable to the search provision of Article I, Section 14 of the Alaska Constitution.

2. *Should suspicionless substance abuse testing be an exception to the warrant requirement?*

Plaintiffs contend that a warrant issued upon a determination of probable cause by a judicial officer is necessary before suspicionless drug testing can be done because such testing does not fall within a recognized exception to the warrant requirement. Usually, "a warrantless search will be considered *per se* unreasonable unless it falls within a previously recognized exception to the warrant requirement." *State v. Myers,* 601 P.2d 239, 241 (Alaska 1979). However, the court can, if required by the unique facts of a case, look, "albeit with great caution, beyond the four corners of previously recognized exceptions to the principles that gave rise to them." *Id.* at 242.

Plaintiffs rely on *Woods & Rohde, Inc. v. State, Dept. of Labor,* 565 P.2d 138 (Alaska 1977), in which the court struck down warrantless OSHA searches as violative of the warrant requirement of Article I, Section 14. However, the decision was based on factors not present in this case. In that case, the court observed that OSHA violations can result in significant fines and imprisonment and for this reason, found that the rights extended to a citizen in a criminal prosecution should also be extended to the owner of a business premise subject to an OSHA search. *Id.* at 151. It also found that without judicial review, far too much discretion was lodged with the official in the field. *Id.* It concluded that the burden of obtaining a warrant was not likely to frustrate the purpose of the OSHA inspections. *Id.* The court also noted that the OSHA regulations extended to all employers thereby reaching many commercial undertakings with no history of intensive regulation. *Id.* at 152.

The Municipality relies on the U.S. Supreme Court decisions in *Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) and *Skinner,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In *Von Raab,* the Court explains that "neither a warrant, nor

probable cause, nor, indeed any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." 489 U.S. at 665, 109 S.Ct. 1384. The Court held that "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interest to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Id.* at 665–66. It found the drug-testing program was not designed to serve the ordinary needs of law enforcement: "Test results may not be used in a criminal prosecution of the employee without the employee's consent." *Id.* at 666. The Court further found that the purposes of the program were to deter drug use and prevent the promotion of drug users to sensitive positions and that these purposes qualified as "special governmental needs, beyond the normal need for law enforcement." *Id.* at 665–66.

In *Skinner*, the Court observed that requiring a warrant in the post-accident context would delay testing which would result in the destruction of evidence, and thereby frustrate the purposes of the search. The Court explained:

> An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents. A warrant assures the citizen that the intrusion is authorized by law, and that is narrowly limited in objectives and scope. A warrant also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case. In the present context, however, a warrant would do little to further these aims. Both the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically in the regulations that authorize them, and doubtless are well known to covered employees. Indeed, in light of the

standardized nature of the tests and the minimal discretion vested in those charged with administering the program, there are virtually no facts for a neutral magistrate to evaluate.

489 U.S. at 621–22, 109 S.Ct. 1402.

The reasoning of the U.S. Supreme Court is persuasive. The Municipality's drug and alcohol testing policy spells out in great detail the procedures to be followed and vests almost no discretion in an individual. Moreover, the test results may not be used in a criminal prosecution and there is no sanction such as a fine or imprisonment. These circumstances readily distinguish the drug-testing case from the OSHA inspections in *Woods & Rohde, Inc. v. State,* 565 P.2d 138 (Alaska 1977).

### 3. Is suspicionless substance abuse testing an unreasonable search and seizure?

The remaining question is whether the search occasioned by suspicionless drug and alcohol testing is unreasonable. Alaska law does not provide a definition of what is "reasonable." Each case [is] to be decided on its own facts and circumstances. *Davis v. State,* 525 P.2d 541, 543 (Alaska 1974). In *Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), the U.S. Supreme Court observed that the traditional probable cause standard is "peculiarly related to criminal investigations" and unhelpful in analyzing the reasonableness of routine administrative functions. 489 U.S. at 668, 109 S.Ct. 1384 (citations omitted). In *Skinner,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), the U.S. Supreme Court made it clear that a showing of individualized suspicion is not a constitutional floor below which a search will be deemed unreasonable. It set forth the following framework:

> In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search

may be reasonable despite the absence of such suspicion.

489 U.S. at 624, 109 S.Ct. 1402.

Thus, in determining the reasonableness of a warrantless search and seizure, a court must determine the nature and extent of the privacy interest, whether there is an important governmental interest at stake, and whether the governmental interest outweighs the privacy interest. This analysis is similar to the one applied to the right to privacy issues. Pursuant to that analysis, this court has determined that suspicionless substance abuse testing does not violate the Fire and Police Department employees' right to privacy. Similarly, the court finds that the Municipality's suspicionless substance abuse testing program does not violate the Fire and Police Department employees' right to be free from unreasonable search and seizure. Likewise, the court finds that the Municipality's drug and alcohol testing program does not violate Plaintiffs' Fourth Amendment or privacy rights under the United States Constitution.[19]

IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED; and

IT IS FURTHER ORDERED that the Plaintiffs' motions for summary judgment are DENIED.

DATED at Anchorage, Alaska, this 14th day of March, 1997.

/s/ Karen L. Hunt
Karen L. Hunt
Superior Court Judge

---

**19.** *See Von Raab* (upholding transfer/promotion of employees in public safety positions); *Skinner* (upholding post-accident testing); *Harmon v.* *Thornburgh,* 878 F.2d 484 (D.C.Cir.1989) (upholding random testing under certain circumstances).